## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS SHERMAN DIVISION

| | | |
|---|---|---|
| TEXAS HEALTH MANAGEMENT LLC, | § | |
| HAMILTON GREEN CREST FUND II L.P., | § | |
| HAMILTON FUND MANAGEMENT LLC, | § | |
| and JOSEPH L. STROFFOLINO | § | |
| | § | |
| Plaintiffs, | § | Case No. 4:18-CV-448-ALM |
| | § | |
| v. | § | |
| | § | **JURY DEMAND** |
| HEALTHSPRING LIFE & HEALTH | § | |
| INSURANCE COMPANY, INC., | § | |
| SCOTT BECKER and JERRY AMON, | § | |
| | § | |
| Defendants. | § | |

## AMENDED PETITION AND COMPLAINT

Plaintiffs respectfully submit this Amended Petition and Complaint in order to amend and supplement the original petition to vacate a final arbitration award which was brought by Texas Health Management LLC ("THM") pursuant to a Motion to Vacate Arbitration Award that was filed in the United States District Court for the Southern District of New York on May 23, 2018, and allege as follows:

## THE PARTIES

1.     Plaintiff Texas Health Management LLC ("THM") is a Texas limited liability company with its principal place of business in Collin County, Texas.

2.     Plaintiff Hamilton Green Crest Fund II L.P. ("HGCF") is a Delaware limited partnership with its principal place of business in Fairfield County, Connecticut. HGCF is an investment fund and it does not transact business or hold any assets in the state of Texas.

3.      Plaintiff Hamilton Fund Management LLC ("HFM") is a Delaware limited liability company with its principal place of business in Fairfield County, Connecticut. HFM is an asset management company and it does not transact business or hold any assets in the state of Texas.

4.      Plaintiff Joseph L. Stroffolino is an individual who resides in Collin County, Texas.

5.      Defendant HealthSpring Life & Health Insurance Company, Inc. ("HealthSpring") is a Texas corporation and subsidiary of Cigna Corp. ("Cigna") with its principal place of business in Davidson County, Tennessee. HealthSpring professes to administer Medicare Advantage plans in 12 states, including Texas.

6.      Defendant Scott Becker is an individual who resides in Collin County, Texas. Mr. Becker is a former district court judge for the 219th judicial district court, Collin County, Texas (the "Texas District Court").

7.      Defendant Jerry Amon is an individual who on information and belief resides in Collin County, Texas. Mr. Amon is a deputy sheriff of Collin County, Texas.

## JURISDITION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs are asserting claims which arise under federal law.

9.      Plaintiffs THM and HFM are asserting claims under 42 U.S.C. § 1983 against Defendant Becker for violating their constitutional rights under the Thirteenth Amendment by unlawfully directing them, through THM's legal counsel, Mr. Robert Cutler, to seize and turn over to Defendant HealthSpring certain electronic forms known as "360s" (see First Claim for Relief below).

10.     Plaintiffs THM, HFM and HGCF are asserting claims under 42 U.S.C. § 1983 against Defendant Becker for violating their constitutional rights under the Fourteenth

Amendment to due process of law by forcing them to turn over the 360s to HealthSpring without affording THM, HFM or HGCF advance notice and an opportunity to be heard (see First Claim for Relief below).

11.     Plaintiff Stroffolino is asserting a claim under 42 U.S.C. § 1983 against Defendant Amon for violating his constitutional rights under the Fourth and Fourteenth Amendments as a result of being unlawfully imprisoned in the Collin County Detention Center due to Amon's failure to follow the directives of in two "Capias" warrants issued by the court (see Second Claim for Relief below).

12.     In addition to these federal claims, THM is petitioning the Court to vacate a final arbitration award under 9 U.S.C. § 10(a). Federal question jurisdiction exists because by depriving THM of its ability to communicate with legal counsel during depositions and throughout the evidentiary hearing, the arbitral tribunal denied THM its constitutional right under the Fourteenth Amendment to due process of law (see Third Claim for Relief below).

13.     The tribunal was obligated to afford THM due process rights for two reasons. First, by virtue of ruling on statutory claims in the arbitration, the tribunal assumed the role of a state actor.[1] The power of the arbitral tribunal derives from the contract, and by deciding claims outside the contract that involve the interpretation of legislative acts, the tribunal perform the function of a court of law and must afford the parties the same due process rights as would apply if the claim had been litigated in a court of law.

14.     Second, in an arbitration, the parties are entitled to a minimum level of due process that comports with the fundamental notions of fairness, including the parties' right to communicate

---

[1] THM asserted a claim under Tennessee Code § 47-50-109 that was decided by the Tribunal (see Dkt. No. 7, Ex. 10 and Ex. 31).

with legal counsel representing the party in the arbitration.

15.     This Court has subject matter jurisdiction over all of the state claims in this action pursuant to 28 U.S.C. § 1337(a).

16.     The Court has personal jurisdiction over all of the defendants because they are all residents of the state of Texas.

17.     Venue is proper under 28 U.S.C. § 1391(a) because all of the defendants are residents of the state of Texas and Defendants Becker and Amon are domiciled in Collin County, which is within the jurisdiction of the Eastern District of Texas.

## FACTUAL ALLEGATIONS

18.     All of the claims in this action share a common set of operative facts related to an arbitration between THM and HealthSpring that was adjudicated by the American Arbitration Association (the "AAA") in a case captioned *Texas Health Management LLC v. HealthSpring Life & Health Insurance Company, Inc.*, AAA Case No. 01-17-0000-6403 (the "Arbitration").

19.     The underlying dispute in the Arbitration concerned the performance of certain contractual obligations under a Business Services Agreement that the parties entered into on May 1, 2013 (the "2013 Agreement") and subsequently amended on January 26, 2016 (the "Amendment" and, together the with 2013 Agreement, the "BSA").

20.     Pursuant to the BSA, THM performed in-home health risk assessments ("HRAs") for Medicare beneficiaries enrolled in HealthSpring's Medicare Advantage plans. The HRA was a type of health and wellness assessment that Cigna asked health providers to perform so that Cigna could identify adverse health conditions of its plan members.

21.     The HRA was performed by a THM nurse practitioner ("NP") in the plan member's home. The HRA included an interview with the plan member about his or her past and

present health conditions, a physical exam (the "360 Exam") and, in some cases, lab work such as a finger stick or blood draw ("Labs").

22.     After performing these services, the examining NP would use an iPad to record the results into an electronic medical chart. This chart would later be converted into a .pdf file and incorporated into the finished work product that THM produced to HealthSring. HealthSpring referred to these electronic medical charts as "360s" or "Forms."[2]

23.     In addition to these services, THM also prepared a report that would be attached to the 360 known as a "health management report" ("HMR"). The HMR listed all of the health conditions mentioned in the 360 that could potentially be assigned a diagnosis code using a reference guide known as the International Classification of Diseases.[3]

24.     Each entry in the HMR included a description of a health condition, the corresponding ICD diagnostic code, and a recommended treatment plan (Dkt. No. 7, Ex. 2[4]).

25.     The final work product THM produced to HealthSpring was an electronic form (the "Form") that included (1) the 360, (2) the HMR and (3) a quality control certificate confirming the accuracy of the information in the HMR (Dkt. No. 7, Ex. 2). THM made these Forms available to HealthSpring for download through a secure site.

26.     Under the 2013 Agreement, HealthSpring paid THM separate fees for each type of service THM performed. HealthSpring paid $250 for each 360 Exam, $50 fee for each HMR

---

[2] Despite the fact that the completed "form" THM produced to HealthSpring was not limited to the medical chart (see ¶ 25 *infra*) HealthSpring uses the terms "360s" and "forms" interchangeably.

[3] The International Classification of Diseases ("ICD") classifies all known diseases, disorders, injuries and other health conditions into alphanumeric codes. It the worldwide standard used for clinical purposes in diagnosing and reporting health conditions. *See http://www.who.int/classifications/icd/factsheet/en/.*

[4] THM's original Motion to Vacate included a supporting memorandum of law with 46 exhibits attached (see Dkt. No. 7.) All of these exhibits are incorporated into this Amended Petition and Complaint by reference and shall be referred to hereinafter by the exhibit numbers as they appear at Dkt. No. 7.

and $50 for each Lab (Dkt. No. 7, Ex. 1).

27.    This pricing arrangement changed in January 2016 when the parties entered into the Amendment.  Under the Amendment, the price for the 360 Exam increased for the exams that were performed in Texas.  For 2015, the price was $345 per exam for the first 10,000 exams, and $295 per exam thereafter (Dkt. No. 7, Ex. 1).  For 2016 and beyond, the price was $295 per exam regardless of the volume of exams that were completed during the year (Dkt. No. 7, Ex. 1).  The Amendment did not change the prices for the HMR or Lab.

### THE CONTRACT DISPUTE

28.    In September 2016 HealthSpring engaged in efforts to re-negotiate the terms of the BSA that would apply in 2017. HealthSpring insisted that THM sign a new contract and statement of work (jointly "MSA") that would replace the BSA in its entirety, including the pricing terms in the BSA.

29.    THM resisted these efforts. The BSA provided a pricing structure that applied for "2016 and beyond." Under the BSA, HealthSpring paid a separate fee for each 360 Exam, Lab and HMR that THM completed. HealthSpring wanted to change these terms so that it would pay a single flat rate for all services that were performed for a member (Dkt. No. 7, Ex. 40 at Tr. 94:3-13). THM believed that if the proposed pricing terms were adopted, it would be unable to generate enough cash flow to cover its operating costs (Dkt. No. 7, Ex. 40, at Tr. 87:5-15).

30.    Whereas under the 2013 Agreement THM had been paid $300 or $350 for the completed HRA depending on whether a lab was performed,[5] under the new pricing scheme THM would be paid $295 per HRA. This would have resulted in a significant decline in THM's revenue, which was a major issue because HealthSpring was THM's only customer and source of revenue

---

[5] Each HRA included either a 360 Exam ($250) and HMR ($50)($250 + $50 = $300), or a 360 Exam ($250), HMR ($50) and Lab ($50)($250 + $50 + $50 = $350). The average payment per HRA in 2016 was $345.

(Dkt. No. 7, Ex. 40, at Tr. 95:23-96:5).

31.    THM also had a problem with the MSA in that it completely overwrote terms in the BSA that THM needed to protect its business. Section 12 of the Amendment for example contained provisions for a 6-month wind-down period (the "6-month Wind-down") in the event either party intended to terminate the contract (Dkt. No. 7, Ex. 1).

32.    Under the 6-month Wind-down provisions, the terminating party was required to provide 6 months' advance written notice prior to termination, and within 30 days after notice was provided, HealthSpring was required to provide THM with a list of members for whom THM could continue to perform HRAs through the end of the contract term.

33.    The parties understood that this 6-month period was necessary in order to allow THM to gradually wind down its business with HealthSpring. THM was entirely dependent on HealthSpring for all of its revenue, and if the contract were able to be terminated abruptly, THM's business would be decimated.  (Dkt. No. 7, Ex. 40 at Tr. 110:21-111:3). These wind-down provisions were notably absent from the MSA (Dkt. No. 7, Ex. 43 at Tr. 1020:21-24).

34.    As a result of THM's reluctance to negotiate the MSA, on January 9, 2017 HealthSpring informed THM that it was withholding all future business volume unless and until THM agreed to move forward with the MSA (Dkt. No. 7, Ex. 40, at Tr. 100:20-101:14; Dkt. No. 7, Ex. 3).

35.    Unable to accept HealthSpring's ultimatum, THM had no choice but to provide notice to HealthSpring that it was terminating the contract (the "Termination Notice") thus triggering the 6-month Wind-down. By triggering the 6-month Wind-down, HealthSpring could no longer withhold business volume as it had been doing.

36.    On January 16, 2017 THM provided the Termination Notice to HealthSpring,

together with invoices for certain services that were underpaid in 2015 and 2016 (the "Invoices")( Dkt. No. 7, Ex. 3, at Tr. 113:15-114:14). THM discovered these underpaid amounts while conducting an account reconciliation in anticipation of the 6-month Wind-down.

37.    On January 27, 2017, HealthSpring informed THM that it refused to pay THM's Invoices (Dkt. No. 7, Ex. 5). It also did not respond to a request by THM to discuss the mechanics of the 6-month Wind-down.

38.    These actions alarmed THM since THM needed HealthSpring's cooperation to cover its operating costs.

## THE RULE R-38 EMERGENCY HEARING

39.    On January 30, 2017 THM filed an emergency Demand for Arbitration with AAA (the "Demand") and applied for emergency measures of protection under AAA Rule R-38 (Dkt. No. 7, Ex. 6 at pp. 1-3).

40.    THM sought relief in the form of an equitable decree to direct HealthSpring to pay the Invoices.

41.    An evidentiary hearing was held in New York City on February 14, 2017 before Emergency Arbitrator David E. Daniels (see Dkt. No. 7, Ex. 7).

42.    At the hearing, HealthSpring claimed that it was not obligated to pay the Invoices because it had already paid for the underlying services.

43.    HealthSpring argued that the pricing structure in the BSA was in fact the same pricing structure it proposed to include in the MSA, namely a single, flat-rate charge for HRA as a whole, whether or not a HMR or Lab were completed (Dkt. No. 7, Ex. 8, at p.2).  HealthSpring attempted to introduce parol evidence to support its argument.

44.    Mr. Daniels rejected HealthSpring's argument. In a reasoned opinion dated

February 17, 2017, Mr. Daniels found that the Amendment "clearly and unambiguously" continued to provide for separate billing for the 360 Exam, HMRs and Labs as reflected in the Invoices (Dkt. No. 7, Ex. 8, at p. 6). Due to the lack of ambiguity in the contract, he rendered his decision without regard to the parol evidence that HealthSpring produced during the hearing (Dkt. No. 7, Ex. 8, at p. 6).

45.    Notwithstanding his findings, however, Mr. Daniels declined to award emergency relief due to the ripeness of THM's claim. He indicated that HealthSpring was not obligated to make any payments "until or about until April 21, 2017" (Dkt. No. 7, Ex. 8, at p. 6, at p. 7).

46.    After issuing his order, Mr. Daniels referred the action to an arbitral tribunal (the "Tribunal") to address related matters, including a claim by THM that HealthSpring acted in bad faith by withholding business volume in attempting to re-negotiate the BSA.

## THE ANNIHILATION OF THM'S BUSINESS

47.    Because THM was not granted immediate relief, its business was on the verge of destruction.

48.    Under the BSA, THM was entitled to receive a monthly cash advance from HealthSpring of $393,235 by February 15, 2017 (the "February Payment")(Dkt. No. 7, Ex. 1, at Section 6), and THM was banking on HealthSpring to make this payment.

49.    But HealthSpring did not make the payment. On February 17, 2017, in a final effort to save its business, THM asked HealthSpring by email if it would abide by the Emergency Arbitrator's decision and pay the Invoices (Dkt. No. 7, Ex. 9).

50.    THM awaited a response but HealthSpring remained silent. On February 20, 2017, THM finally exhausted all of its remaining funds. THM was forced to lay off its entire workforce of approximately 50 employees without the ability to provide any advance notice (Dkt. No. 7, Ex.

40, at Tr. 142:11-15).

51.    THM defaulted on its loans and breached all of its contracts, including its office lease, supply and service contracts and equipment leases.  THM was unable to pay its employees' final paychecks and taxes, and it was forced to immediately vacate its office space. (Dkt. No. 7, Ex. 10).  THM owed (and continues to owe) its creditors more than $2.3 million.

**COMMENCEMENT OF THE SECOND PHASE OF ARBITRATION**

52.    On February 21, 2017, THM amended its arbitration pleadings to include additional claims (Dkt. No. 7, Ex. 10).  Among these was a claim against HealthSpring for anti-competitive conduct amounting to an attempted to monopolization under Sherman Act § 2. THM asserted that HealthSpring had been directing business volume away from THM and toward its affiliate Alegis Care ("Alegis"), which was a competitor of THM. THM also asserted certain other statutory and common law claims, including a statutory claim for violation of Tennessee Code § 47-50-109.

53.    In its Answering Statement, HealthSpring denied all liability and asserted a counterclaim for breach of contract, which THM in turn denied. In its request for relief, HealthSpring requested the Tribunal to direct THM to turn over all of the 360s in its possession or else award damages (Dkt. No. 7, Ex. 11).

54.    But before the arbitration could move forward, THM needed to obtain financing. THM worked out a joint venture arrangement with HGCF and the parties entered into a Joint Venture Agreement on March 15, 2018 (the "JVA"). Under the JVA, HGCF would make a capital investment in the joint venture pursuant to which contributed funds would be advanced to THM to cover its ongoing costs and expenses during the Arbitration, including any arbitration fees and costs.

55.     THM and HealthSpring also agreed to fee-splitting arrangement for the arbitrators' compensation. THM agreed to have the matter heard before an arbitral tribunal composed of three arbitrators (the "Tribunal") in exchange for HealthSpring's agreement to pay the compensation of two of the three arbitrators and split the compensation of the third arbitrator (Dkt. No. 7, Ex. 12). This arrangement was conveyed to the AAA and the case manager Ms. Lisa Romeo recorded it in the case file (Dkt. No. 7, Ex. 12).

## THE PRE-HEARING ORDERS

56.     The Tribunal was constituted on April 10, 2017. The three arbitrators were Mr. Albert M. Appel, Hon. Gerald Harris and Andrew F. McBride, III.  Mr. Appel was appointed Chair.

57.     From the outset, the Tribunal deferred all decisions to Mr. Appel.  The first order provided that "[u]pon Agreement of the Tribunal, orders of the Tribunal may be signed by the Tribunal Chair on behalf of the entire Tribunal and shall be effective as if signed by all Tribunal members" (Dkt. No. 7, Ex. 13, at ¶ 25).

58.     Ironically, despite the fact that this language infers that the Tribunal members had yet to agree to confer this authority on Mr. Appel, the signature lines in the order for all three arbitrators were signed only by Mr. Appel himself.  Mr. Appel signed his name, as well as the signatures of the other arbitrators with the notation "(by AMA)" opposite their names (Dkt. No. 7, Ex. 13, at p. 12).

59.     On June 6, 2017, the Tribunal issued Order No. 2 in which it concluded that Arbitrator Daniels' decision was not binding on the Tribunal.  The Tribunal stated that Mr. Daniels' findings of fact were "interim in nature and subject to review and modification by the permanent panel" (Dkt. No. 7, Ex. 14, at p. 2). It also determined that Mr. Daniels' conclusions of

law regarding the meaning of the BSA were "dicta and not binding on this Panel" (Dkt. No. 7, Ex. 14, at p. 2). Even though the order was purportedly being delivered for the Tribunal, there was only one signature line and Mr. Appel was the one who signed it.

60.    Following Order No. 2, Mr. Appel took over as "Discovery Master," and proceeded to make several rulings against THM. These included a ruling on June 16, 2017 that allowed HealthSpring to redact all "commercially sensitive terms" in contracts THM requested to support its anti-trust claim under Sherman Act § 2 (Dkt. No. 7, Ex. 15). Without the pricing terms THM had no way of to assess, among other things, the competitiveness of the market within HealthSpring's plans.

61.    As a result of this order, HealthSpring simply produced redacted copies of the contracts and then moved for summary disposition on the (Dkt. No. 7, Ex. 17). THM requested that the Tribunal "re-consider [its] ruling and allow [THM] to review [the redacted pricing terms]" (Dkt. No. 7, Ex. 18). Mr. Appel, purportedly acting on behalf of the full Tribunal, ruled that THM could "offer at the hearing such evidence as it may produce in support of [its antitrust] claim" (Dkt. No. 7, Ex. 19). But this was effectively a denial of THM's request. THM did not possess, and therefore could not produce, copies of the unredacted contracts.

62.    Mr. Appel was again the only arbitrator who signed the order (Dkt. No. 7, Ex. 19, at p. 5). The order contained three signature lines, one for each arbitrator, but Mr. Appel signed all three.

63.    Without pricing terms THM could not satisfy its burden of proof to show monopolistic intent. Therefore, THM was forced to withdraw its Sherman Act claim (Dkt. No. 7, Ex. 20).

## THE EVIDENTIARY HEARING

64.     Mr. Appel's hostility towards THM carried over into the pre-hearing status conference. At the conference, Mr. Appel reversed a portion of the Tribunal's ruling in Order No. 1 which was intended to relieve THM's financial stress.

65.     Order No. 1 provided that HealthSpring would pay all of the costs to transcribe the hearing (Dkt. No. 7, Ex. 13, at ¶ 17).  Mr. Appel ruled that HealthSpring did not need to abide by this requirement anymore (Dkt. No. 7, Ex. 21).

66.     The hearing was handled in an equally one-sided manner. On October 23, 2017, the very first day of the hearing, Mr. Appel ordered THM's managing director and majority owner, Mr. Joseph Stroffolino, not to communicate with THM's counsel (Dkt. No. 7, Ex. 40, at Tr. 273:18-274:8). Mr. Appel made this decision at HealthSpring's request and without affording THM an opportunity to respond. Mr. Appel also did not enforce his ruling equally (Dkt. No. 7, Ex. 40, at Tr. 273:18-274:8).  HealthSpring's witnesses were permitted to attend the hearing with counsel present, even on those days they were being cross-examined.

67.     Mr. Appel's misconduct did not end there. During THM's cross-examination of witnesses and Mr. Appel answered questions for the witnesses or led them to change their answers.

68.     In one such instance, THM's counsel asked HealthSpring's Medical Director, Dr. Michael Fessenden, what he understood the pricing terms of the contract to mean. Dr. Fessenden initially stated that he believed the Amendment superseded and replaced the entire agreement, a position which was inconsistent with HealthSpring's prior assertions, but then changed his answer after intervention by Mr. Appel:

> [MR. CUTLER]: So are you saying that you thought this agreement completely replaced what was already?
>
> A. Correct, because that was the point of we were no longer going to do HMRs, and we

were going to pay for labs regardless if they were done or not done.

Q. So, the rest of the agreement -- the rest of the 2013 agreement was completely -- did not apply?

ARBITRATOR APPEL: That's not what he said. He said he thought it replaced Exhibit B.

MR. CUTLER: Well, I --

ARBITRATOR APPEL: He didn't say replaced the entire agreement.

BY MR. CUTLER: All right. So, you're saying you didn't think it replaced the entire agreement?

A. No, just that specific payment around what services were provided and how those would be paid for.

(Dkt. No. 7, Ex. 46, Tr. 1814:9-1815:20).

69.    Mr. Appel not only answered questions for witnesses but also expounded on their answers. For example, THM questioned Dr. Fessenden as to whether he knew that THM was financially dependent on HealthSpring. Mr. Appel intervened as follows:

[MR. CUTLER:] So, if [revenue from HealthSpring] was necessary to cover operating expenses, how can you say that you thought or had reason to believe that there were other companies that THM was doing business with?

ARBITRATOR APPEL: He didn't say you [sic] had reason to believe. He said he didn't know whether they were doing business with 50 other customers or not.
….
ARBITRATOR APPEL: He also said -- Mr. Cutler, he also said something to the effect that he didn't know if the prepayment was intended to deal with this line of business and he was separating it from potential revenue in other -- that other customers provided.

MR. CUTLER: I'm not sure I understand that. So, what other lines --

ARBITRATOR APPEL: I think he was saying that it's possible for internal financial purposes that THM might have had, that it was trying to get a self-sustaining operation just related to these customers. Even if it was making money hand over fist on somebody else,

they still -- THM still wanted to get money coming in on a cash-flow basis that would have sustained the THM -- the HealthSpring business. I think that's the gist of what he was testifying to.

THE WITNESS: That is correct.

(Dkt. No. 7, Ex. 46 at Tr. 1814:9-1815:20).

70.    Mr. Appel also cut off witness testimony to answer questions, such as in the following instance:

MR. CUTLER: In other words, as we just went over this email, there was [sic] more than 10,000 names left that could have been distributed in Texas, right?

A: (no response.)
….

Q: So what I'm trying to figure out is if the amount that was left distributable was factored in here, how these numbers would change? And I mean—

ARBITRATOR APPEL: That doesn't make sense because the 10,000 names—

The Witness: Would be membership.

ARBITRATOR APPEL: --were distributed in the fourth quarter or some portion of them.

Mr. Cutler: No, they weren't all – were they all distributed?

ARBITRATOR APPEL: Some—

The Witness: Some –

ARBITRATOR APPEL: Some portion after scrubbing and so on.

The Witness – right.

(Dkt No. 7, Ex. 45, at 1736:11-1737:15).

71.    Mr. Appel would even interrupt the other arbitrators to answer for HealthSpring's witnesses:

ARBITRATOR MCBRIDE III: [ ] you folks were talking about holding back the list of patients until the MSA and the SOW were completed, right?

ARBITRATOR APPEL: It doesn't say that.

ARBITRATOR MCBRIDE III: Well, let the witness answer the question.

He would even explain what the witnesses were thinking:

> [MR. CUTLER:] So, at this point, did you have any reason to doubt that THM wasn't going to perform -- that aside from the -- well, let me back up. You said the e-mails --

> ARBITRATOR APPEL: Mr. Cutler, your letter to the AAA on January 30th makes a number of statements about the ability of THM to stay in business, laying off people, not meeting operating costs.

> MR. CUTLER: Yes.

> ARBITRATOR APPEL: So, what's the issue here? You're asking did he know that they could still stay in business. Your own letter, one reading this could think the next day you were going to go up in a cloud of smoke.

(Tr. 1993:22-1994:18). These are but a few of the examples of improper behavior exhibited throughout the hearing.

## THE INTERIM RULING

72.     The evidentiary hearing ended on November 15, 2017 but the Tribunal's misconduct continued unabated. On December 14, 2017, the Tribunal acting through Mr. Appel issued Order No. 6 (the "Interim Ruling") in which it awarded HealthSpring possession of the 360s, the ultimate relief HealthSpring was seeking in the case (Dkt. No. 7, Ex. 22).

73.     The ruling was made in response to an application by HealthSpring on December 5, 2017 to compel THM to turn over the 360s.  HealthSpring argued that if THM did not give HealthSpring the 360s as soon as possible, HealthSpring could potentially not profit from them and thus incur "irreparable harm" (Dkt. No. 7, Ex. 23, at p. 4).

74.     According to HealthSpring, the data in the 360s had potentially significant value because they could be used to obtain payments from the Centers for Medicare & Medicaid Services ("CMS"), the government agency which administers Medicare.  If the data were not

submitted to CMS by January 31, 2018, so argued HealthSpring, any amounts that HealthSpring could potentially derive from the data would be forever lost (Dkt. No. 7, Ex. 23, at p. 4).

75.     HealthSpring claimed that January 31, 2018 was a "final deadline" and that "[a]fter the CMS deadline [on January 31, 2018], HealthSpring can no longer submit the data to CMS" (Dkt. No. 22, Ex. 23, at p. 4).

76.     The Tribunal accepted HealthSpring's argument. In its order, the Tribunal found that if it did not take immediate action "[t]he value of the Forms to HealthSpring will be entirely dissipated" (Dkt. No. 7, Ex. 23, at p. 4, at p. 4). It claimed that it was acting pursuant to AAA Commercial Rule 37(a), a rule which empowers an arbitrator to take interim measures to protect and conserve property (Dkt. No. 7 Ex. 23, at pp. 4-5). *See* AAA Commercial Rule R-37(a).

77.     The Tribunal did not explain, however, how allowing HealthSpring to profit from the 360s protects or conserves property.  The Tribunal also did not point to any evidence to support its finding that the value of the Forms would be "entirely dissipated."

78.     Mr. Appel once again was the only arbitrator who signed the order. He again signed his own name and the signatures of the two other arbitrators (Dkt. No. 7 Ex. 22, at pp. 4-5).

## THM'S DISCOVERY OF UNDISCLOSED PAYMENTS

79.     On December 8, 2018, six days before the Tribunal ruled on HealthSpring's application, the AAA released a supplemental disclosure to THM that Mr. Appel had been acting as the sole arbitrator for HealthSpring's parent company Cigna while concurrently serving as an arbitrator in the Arbitration (Dkt. No. 7, Ex. 24).

80.     HealthSpring also disclosed in a letter brief that all along it had been regaling the arbitrators with free meals and drinks during the hearing (Dkt. No. 7, Ex. 23, at p. 5). THM was under the impression that the arbitrators' meals and drinks were paid for by the AAA.

81.     At a hearing on December 26, 2017, THM raised objections to the Interim Ruling. THM argued that the Tribunal lacked authority to grant the order and that THM was being treated unfairly.

82.     THM argued that it was being forced to specifically perform the contract and there was no contractual basis for this form of relief. In addition, even if equitable relief could be granted, the Tribunal had not assessed the merits of HealthSpring's claims and no evidence of harm, let alone irreparable harm, had ever been produced.

83.     THM also questioned Mr. Appel's neutrality, especially in light of statements in the Interim Ruling which claimed THM stated that it was "judgment proof" and that "regardless of the outcome on the merits, the Forms will be delivered to HealthSpring" (Dkt. No. 7 Ex. 22, at p. 4). THM in fact never made these statements.

84.     To the contrary, THM conveyed to the Tribunal that "Respondent *is not* entitled to the Forms as a matter of right regardless of who wins the case" (emphasis added) (Dkt. No. 7, Ex. 22, at p. 1).

85.     Due to THM's resistance in turning over the 360s, HealthSpring requested permission to seek sanctions in its post-hearing brief and the Tribunal granted the request.

86.     Three days later, on December 29, 2017, THM discovered that HealthSpring had misrepresented to the Tribunal the extent to which it would lose profits if it did not submit data from the 360s to CMS prior to January 31, 2018.

87.     HealthSpring revealed to THM in an email exchange that it had already received payments from CMS for the data contained in at least 10,153 of the approximately 14,800 360s THM was holding (Dkt. No. 7, Ex. 26). The value of the 360s was not in danger of being "entirely dissipated" as the Tribunal indicated in the Interim Ruling (Ex. 22, at p. 4).

88.    THM reported this information to the Tribunal on January 2, 2018 and requested that the Interim Ruling be immediately reversed (Ex. 26).  On January 5, 2018, Mr. Appel purportedly acting "for the full Panel," denied the request without any explanation (Dkt. No. 7, Ex. 27).

### HEALTHSPRING'S PETITION TO CONFIRM THE INTERIM RULING

89.    After Mr. Appel's denial of THM's request, HealthSpring hastily commenced an action in the 219th District Court, Collin County Texas (the "State Court Case"). Defendant Becker was the presiding judge in the case.

90.    On January 9, 2018 HealthSpring filed an Application for Temporary Restraining Order and Petition for Temporary Injunction to Enforce Arbitration Order (the "Petition and Application") with the court.  HealthSpring included a copy of the Interim Ruling to support its Petition and Application, but omitted a number of pertinent documents.

91.    Among these was Order No. 3, which specifically provided as follows:

[HealthSpring] has represented, and it is so ordered, that it will not seek to obtain documents outside of the arbitration process that THM considers to be its documents. At the conclusion of the instant arbitration, applications may be made relating to obtaining or maintaining possession of such documents.

 (Dkt. No. 7, Ex. 15).

92.    Shortly before filing, a copy of the Petition and Application was served on THM. THM in turn disclosed this document to its financing partner HGCF. Concerned that THM might jeopardize HGCF's JVA investment by releasing the 360s without properly challenging the legality of the Interim Ruling, HGCF demanded that possession and control of the 360s be turned over to HFM, the asset management firm of the Hamilton family of funds.

93.     On January 11, 2018, THM, HGCF and HFM, as escrow agent, entered into an

escrow agreement (the "Escrow Agreement"), pursuant to which THM relinquished full possession and control of the 360s to HFM. The agreement required HFM to continue holding the 360s until it received notification that THM successfully opposed the Interim Ruling or else failed to succeed in all of its appeals. A copy of the Escrow Agreement is attached hereto as **Exhibit A**.

94.    The Escrow Agreement was governed and construed in accordance with the laws of Connecticut and it required that any legal action or proceedings arising out of correlating to the transactions in the agreement be brought in the state or federal courts in Connecticut.

95.    On January 12, 2018, the Texas District Court issued a temporary restraining order (the "TRO") requiring THM to turn over the 360s within 24 hours. Because the order was issued late in the day on a Friday, it was impossible for THM to comply before it would be in violation of the TRO.  THM could not comply with the order in any event because it did not possess or have control over the 360s.

96.    Two weeks later, it became evident that the TRO was no longer necessary. On January 26, 2018 CMS announced that it was extending the data submission deadline from January 31, 2018 to May 4, 2018 (Dkt. No. 7, Ex. 29).

97.    This made no difference to the Texas District Court. On January 29, 2018 the court converted the TRO into a temporary injunction.

98.    On January 31, 2018, the Tribunal was informed that the deadline had been extended. THM again requested that the Tribunal reverse the Interim Ruling on the grounds that it was no longer necessary and that Mr. Stroffolino was in danger of being imprisoned for contempt.

99.    THM also requested that the Tribunal reverse its decision to allow HealthSpring to seek sanctions.  Mr. Appel, again delivering an email order "for the full Panel," denied these

requests. He reasoned that "Order No. 6 is part of the record of this arbitration and the Panel sees no reason it should be withdrawn and not remain part of the record" (Dkt. No. 7, Ex. 30).

100.    As a result of Tribunal's refusal to act, the Texas District Court held THM in contempt at a hearing on March 23, 2018. THM was represented by counsel at the hearing but Mr. Stroffolino, THM's managing director and majority member, was not present.

101.    Also at the hearing HealthSpring made an application to Judge Becker for a bench warrant for Mr. Stroffolino's arrest and incarceration, which Defendant Becker promptly granted. Judge Becker then issued a "Capias" for Mr. Stroffolino's arrest (the "First Capias"). The Capias directed the Collin County Sheriff to arrest Mr. Stroffolino and bring him to the Collin County Jail until he or a representative of THM complied with the court's previous orders to the satisfaction of HealthSpring.

102.    A second "Capias" certified by the deputy clerk of the Texas District Court was issued shortly thereafter (the "Second Capias"). The Second Capias did not direct the sheriff to bring Mr. Stroffolino to jail. Rather, it directed the sheriff to take custody of him and bring him before the Texas District Court. Copies of the First Capias and Second Capias are attached hereto as **Exhibit B**.

## THE FINAL AWARD

103.    On March 14, 2018, the Tribunal issued the final arbitration award (the "Final Award") and ruled against THM on all of its claims. The Tribunal ordered THM to pay $737,500 in compensatory damages for breach of contract (Dkt. No. 7, Ex. 31).

104.    The Tribunal without explanation also ordered THM to pay directly to HealthSpring $69,779.56 in arbitration fees that the Tribunal claimed THM owed to the AAA. There are no provisions in the BSA that allow a party to be awarded amounts that the other party

owes to the AAA. The Tribunal's award of these damages also contradicted the earlier fee sharing agreement between THM and HealthSpring that Ms. Romeo had recorded in the case file.

105.    The Tribunal justified its decision on the grounds that THM "repudiated" the BSA when it informed HealthSpring that THM would be unable to perform the contract because HealthSpring was withholding business volume (Dkt. No. 7, Ex. 31, at p. 23).

106.    The Tribunal also interpreted the pricing provisions of the Amendment and found that the contract was ambiguous, a finding that was at odds with Mr. Daniels' finding in the Rule R-38 emergency arbitration (Dkt. No. 7, Ex. 31, at p. 12).

107.    Whereas Mr. Daniels found that the language in the BSA was "clear and unambiguous," the Tribunal found that "the Agreement in its entirety is ambiguous" (Dkt. No. 7, Ex. 31, at pp. 11-12).  The Tribunal felt that if separate pricing for HMRs and Labs were applied, a scenario could result where THM could end up owing money while at the same time receiving substantial additional revenue (Dkt. No. 7, Ex. 31, at pp. 11-12). This, so said the Tribunal, would create an "incongruous result" and therefore an ambiguity existed as to the parties' true intent. (Dkt. No. 7, Ex. 31, at pp.12).

108.    It also determined that the term "flat rate" was ambiguous because it had no "universally accepted, generally recognized definition" (Dkt. No. 7, Ex. 31, at pp.12).  It reached this conclusion, however, without examining the context in which the term actually appears in the contract. The term "flat rate" as it appears in context is "flat rate reimbursement paid monthly to Vendor under this paragraph 6" (Dkt. No. 7, Ex. 1, Amendment, at Section 6). There is only one monthly rate mentioned Section 6, and that is the $393,235 payment due by 15th day of each month.

## THM'S CHALLENGE TO THE FINAL AWARD

109.    Given the many injustices committed by the Tribunal, THM commenced this action in the U.S. District Court for the Southern District of New York (S.D.N.Y.) to challenge the Final Award. On May 23, 2018 THM filed a Motion to Vacate Arbitration Award (the "Motion to Vacate") with the court and then served a notice of the motion, together with the motion itself and supporting memorandum of law, on HealthSpring on May 29, 2018. The action subsequently transferred to this Court on June 25, 2018 pursuant to 28 U.S.C. § 1404(a).

## POST-PETITION DEVELOPMENTS

110.    Despite having been served with the Original Petition on May 29, 2018, HealthSpring never responded to it. Instead, HealthSpring made an underhanded attempt to avoid this action altogether. Within one week after being served, HealthSpring requested an extension of the time to respond to the Original Petition, upon which THM gave its consent, thus extending the response date to July 3, 2018 (Dkt. No. 20, June 8, 2018 letter, at p. 1). Then separately, HealthSpring file a new petition in State District Court case to confirm the Final Award and strike the Original Petition (Dkt. No. 32, Ex. 3). HealthSpring argued that the Final Award should be confirmed because the Original Petition was untimely, and in support of this argument asserted to the court that this Court had already ruled that it lacked subject matter jurisdiction to rule on the motion. This assertion was false.

111.    In response to HealthSpring's filing, THM filed a motion to stay the proceedings (the "Motion to Stay"), informing the Texas District Court that, contrary to HealthSpring's assertion, this Court had not yet ruled on its own subject matter jurisdiction. THM sought to stay further proceedings so as to allow this Court to rule on subject matter jurisdiction given that THM brought the Motion to Vacate initially in federal court and intended it to be heard in federal court.

112.    While these events unfolded, the bench warrant against Mr. Stroffolino remained outstanding. On August 13, 2018 Mr. Stroffolino was arrested at his home by Deputy Sheriff Amon. Mr. Amon did not request any documents from Mr. Stroffolino or make any attempt to bring him before the Texas District Court. Instead, Mr. Amon brought Mr. Stroffolino directly to the Collin County Detention Center (the "Collin County Prison") and inexplicably booked him in on a third degree felony. Mr. Stroffolino was incarcerated from August 13, 2018 to August 17, 2018.

113.    On August 16, 2018, Mr. Stroffolino petitioned the Texas Court of Appeals for the Fifth District for a writ of habeas corpus. The Texas Court of Appeals granted Mr. Stroffolino a conditional release on August 17, 2018 and then issued the writ on December 12, 2018 on the grounds that the first "Capias" issued by Judge Becker was unlawful and violated established Texas Supreme Court precedent.  A copy of the Memorandum Opinion granting the writ is attached hereto as **Exhibit C**.

114.    On September 6, 2018, after noting his astonishment that Mr. Stroffolino "somehow managed to get a bond issue on a contempt charge," Judge Becker proceeded to rule against THM on the Motion to Strike, the Motion to Stay and the Motion to Vacate (Dkt. No. 40, Ex. A, at Tr. 5:6-9). Judge Becker apparently justified his denial of the Motion to Stay on the grounds that "[c]omplaining is the uniform of the loser" (Dkt. No. 40, Ex. A, at Tr. 14:20-21; 12:15).

115.    Judge Becker also entertained an application by HealthSpring's counsel on the spot to compel THM's counsel, Mr. Cutler, to turn over the 360s (Dkt. No. 40, Ex. A, at Tr. 15:16-22).

116.    Judge Becker swore in Mr. Cutler as a witness, examined him about the whereabouts of the 360s and then ordered him to go find them (Dkt. No. 40, Ex. A, at Tr. 16:1-

17:12).

117.     After a recess, Mr. Cutler reported to Judge Becker that HFM was holding the 360s in Connecticut as escrowed property under the Escrow Agreement (Dkt. No. 40, Ex. A, at Tr. 19:1-20:6).

118.     Judge Becker then proceeded to order Mr. Cutler to act on behalf of HFM and take a thumb drive containing the 360s from a locked filing cabinet in HFM's office in Connecticut, and turn it over to HealthSpring at HealthSpring's counsel's office in Pennsylvania :

> THE COURT: Have I not been clear on how important it is to get this thumb drive over right now?
>
> MR. CUTLER: I understand, but you're forcing the company to breach a contract. That's why I'm –
>
> THE COURT: I'm requiring the company to comply with a court order that it may have put itself in a position where it breaches a contract to comply with the court order. I care more about it obeying my orders ….

 (Dkt. No. 40, Ex. A, at Tr.20:12-24).

119.     Mr. Cutler had no choice but to make arrangements for the 360s to be turned over to HealthSpring, and 360s were delivered to HealthSpring the following day.

120.     HGCF lost all of the security to protect the amount it had invested under the JVA, which as of the date that the 360s were taken was $205,597.41. As a result of the loss of HGCF's security, HGCF has terminated the arrangement under the JVA to provide THM with financing.

## **FIRST CLAIM FOR RELIEF**

### **VIOLATION OF 42 USC § 1983**

#### **(by Plaintiffs THM, HFM and HGCF against Defendant Becker)**

121.     Plaintiffs incorporate and re-allege by reference the foregoing paragraphs 1 through 120 inclusive, as if they were fully set forth herein.

122.    42 U.S.C. § 1983 provides a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another person's constitutional rights.

123.    Defendant Becker was the presiding Texas District Court judge during the State Court Case and therefore was a state actor and acted under color of state law.

124.    A hearing in the case took place on September 6, 2018. At the hearing, Judge Becker ordered THM's counsel, Mr. Cutler, to "find the forms." (Dkt. No. 40, Ex. A, at Tr. 17:9).

125.    After a recess, Mr. Cutler reported to Judge Becker that the forms were on a thumb drive locked up in a filing cabinet in HFM's office in the state of Connecticut (Dkt. No. 40, Ex. A, Tr. 18 3-13). Mr. Cutler also informed Judge Becker that he did not have the authority to take the 360s from THM's office. Nevertheless, Judge Becker ordered Mr. Cutler, to do take the 360s anyway. He directed Mr. Cutler to "get [a] thumb drive to [HealthSpring] as fast as possible" (Dkt. No. 40, Ex. A, Tr. 20:23-25).

126.    The Escrow Agreement did not permit Mr. Cutler to take the 360s (see Ex. A at ¶ 1.3). The 360s were required to be held in escrow by HFM to protect HGCF's investment, which as of that date comprised $205,597.41 in cash advances to THM in the aggregate. HGCF had a protected property interest in the 360s as they secured this investment.

127.    Nevertheless, because Judge Becker was ordering Mr. Cutler to act, Mr. Cutler had no choice but to make arrangements for the 360s to be turned over to HealthSpring. Immediately following the hearing, Mr. Cutler called his wife in Connecticut and instructed her to obtain the key to the filing cabinet, go to the HFM office, remove the thumb drive from the filing cabinet and mail it by FedEx overnight delivery to HealthSpring's counsel, Ballard Spahr, in Philadelphia. These instructions were followed and the thumb drive was delivered to Ballard Spahr the

following day.

128.    Defendant Becker had no legal basis to order Mr. Cutler to turn over the 360s. The court did not have subject matter jurisdiction because Judge Becker was directing the transfer of property located in the state of Connecticut, which is well outside the jurisdictional boundaries of the state of Texas. Judge Becker thus acted unlawfully by exercising his judicial powers across state lines.

129.    The court also did not have personal jurisdiction over HGCF, its general partner Hamilton Green Crest Fund GP LLC (the "GP"), or HFM. None of these entities were formed in the state of Texas. None of these entities own any assets or transact any business in the state of Texas. None of the partners of HGCF or members of HFM reside in the state of Texas.

130.    Moreover, the Escrow Agreement is governed by Connecticut law and is subject to the jurisdiction of the Connecticut courts. All matters arising out of correlating with respect to the escrowed property are required to be litigated in the state of Connecticut (Ex. A, Section 7.5).

131.    Mr. Cutler also lacked the authority to act unilaterally on behalf of HFM. Mr. Cutler owns only 10.45% limited partnership interest in HGCF. He also owns only 33% of the membership interests in the GP, HGCF's general partner, and is one of four members.

132.    The GP owns 100% of HFM and must authorize actions to be taken by HFM. None of the members of the GP other than Mr. Cutler were even aware that the hearing was going to take place.

133.    Mr. Cutler is a co-managing director of HFM, and any action taken by him on behalf of HFM, with our without authority from HGCF, requires the written consent of the other co-managing director, Mr. Matthew Young. Mr. Young, however, was unaware that the hearing was going to take place.

134.    Mr. Cutler informed Judge Becker that the Escrow Agreement prohibited him from seizing the 360s, but Judge Becker, branding HGCF a "shell company," ordered Mr. Cutler to do it anyway (Dkt. No. 40, Ex. A, at Tr. 10:17-22).

135.    Mr. Cutler also was not representing the interests of HFM or HGCF at the hearing. None of the members of the GP other than Mr. Cutler were even aware that the hearing was going to take place.

136.    Mr. Cutler appeared at the hearing solely as legal counsel for THM. He was not acting as legal counsel for HFM or HGCF, nor did any of the members of the GP or Mr. Young authorize him to do so. HFM and HGCF were not even parties in the State Court Case.

137.    By ordering Mr. Cutler to seize the 360s, Judge Becker forced HFM, through Mr. Cutler, to take action against its own will in breach of its contractual obligations under the Escrow Agreement and contrary to its own financial interests, thereby violating its Thirteenth Amendment rights against involuntary servitude. HFM breached the Escrow Agreement as it was required to hold the 360s in escrow for the benefit of HGCF and was unable to do so (Ex. A, Section 1.3).

138.    Since Mr. Cutler was representing THM at the hearing, Judge Becker's order also caused THM, through Mr. Cutler, to take action against its own will in breach of its contractual obligations under the Escrow Agreement. THM breached its obligation not to take any actions with respect to the escrowed property (Ex. A, Section 1.4).

139.    Defendant Becker also violated the constitutional rights of HFM, HGCF and THM to due process of law under the Fourteenth Amendment because he unlawfully forced HFM and/or THM to turn over the 360s without affording HGCF or HFM advance notice of the order and an opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). THM's due process rights were also violated in that it was not afforded notice prior to the hearing

that the court would be ruling on whether to compel THM's counsel to breach THM's obligations under the Escrow Agreement. *See id.*

140.    As a result, HGCF was deprived of a constitutional property right in the 360s, which were security under the Escrow Agreement. HFM was deprived of its constitutional property right to hold the 360s for the benefit of HGCF. HGCF terminated its obligations to continue to advance funds to THM and therefore THM was deprived of its constitutional property right to obtain cash advances under the JVA.

141.    Defendant Becker cannot claim absolute immunity as a judge of the Texas District Court because his actions were taken in the absence of all jurisdiction. As asserted in ¶¶ 128-129 *supra*, the court lacked subject matter jurisdiction to direct the transfer of property located in Connecticut. It also lacked personal jurisdiction over HFM, which was the custodian of the 360s, and HGCF, which was the beneficiary under the Escrow Agreement, because these entities do not have any contact with the state of Texas.

142.    Mr. Becker acted willfully and maliciously, knowing full well that he was causing THM and HFM to breach their contractual obligations and depriving HGCF of financial security, as evidenced by the verbal exchange between Defendant Becker and Mr. Cutler indicated in ¶ 118 *supra*.

143.    In committing these acts, Defendant Becker caused the Plaintiffs substantial harm. All of the security backing HGCF's investment in the JVA was lost, resulting in damages to HGCF in the amount of $205,597.41.

144.    In breaching the Escrow Agreement, HFM and THM are responsible for recouping HGCF's losses and therefore were damaged in the amount of $205,597.41.

145.    THM has been denied the ability to obtain further financing from HGCF. The total

amount advanced to THM was $205,597.41, or $102,798.71 per year in advances. THM would have received at least one additional year of financing from HGCF. Accordingly, THM was damaged in the amount of $102,798.71.

146.    Given Defendant's blatant abuse of his power and authority as a state court judge, HFM and HGCF are entitled to punitive damages in the amount of at least $616,792.23. THM is entitled to punitive damages in the amount of at least $308,396.12.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF 42 USC § 1983

**(by Plaintiff Stroffolino against Defendant Amon)**

147.    Plaintiff incorporates and re-alleges by reference the foregoing paragraphs 1 through 146 inclusive, as if they were fully set forth herein.

148.    Defendant was a deputy sheriff of Collin County, Texas during the Texas District Court Case and therefore was acting under color of state law.

149.    After Plaintiff did not appear at the hearing on March 23, 2018, the Texas District Court issued the First Capias, directing the sheriff of Collin County to arrest Stroffolino and "take [him] to the County Jail of Collin County, Texas, until he, or a representative of defendant complies with the Court's Orders to the satisfaction of the plaintiff in this matter." The First Capias was not certified by Judge Becker.

150.    The Texas District Court also issued the Second Capias which was certified by the Deputy District Clerk of the Texas District Court. The Second Capias did not direct the sheriff to bring Mr. Stroffolino to jail. Rather, it directed the sheriff to take custody of him and bring him before the Texas District Court.

151.    On August 13, 2018, Plaintiff was arrested by Defendant at Plaintiff's home. At

the time of the arrest, Defendant simply told Plaintiff that he was there to "bring him in." Defendant then took Plaintiff into custody, placed him in a patrol car, brought him to the Collin County Prison to have him processed, and then did nothing further.

152.    Defendant failed to comply with the directives of the Second Capias, either intentionally, or out of gross negligence because he failed to read the Second Capias. The Capias directed the sheriff to hold Plaintiff in custody and bring him before Judge Becker "instanter" to answer for his failure to appear. Defendant in fact made no attempt to bring Plaintiff before Judge Becker at all. Instead Defendant brought Plaintiff directly to prison and left him there.

153.    Defendant also failed to comply with the directives of the First Capias, either intentionally, or out of gross negligence because he failed to read the First Capias. The First Capias specifically directed the sheriff to bring Plaintiff to prison, but only until he "complie[d] with the Court's Orders to the satisfaction of the plaintiff." Defendant never asked Plaintiff to produce the 360s. He never told Plaintiff that Plaintiff was going to be held in prison until he complied with the orders. He never informed the Plaintiff that while incarcerated he would be unable to obtain any documents that might be necessary to comply with the orders.

154.    Plaintiff has a constitutional right to freedom from illegal incarceration under the Fourth Amendment. Defendant's failure to follow the directives of both Capias warrants violated this constitutional right. Plaintiff was unlawfully incarcerated either because Defendant brought him directly to jail instead of to the court as required by the Second Capias, or because he incarcerated Plaintiff without taking any action that would afford Plaintiff the opportunity to comply with the court's orders either before or after incarceration.

155.    As a result of Plaintiff's illegal incarceration, he did not have the ability to obtain the 360s or communicate to the court that he could not obtain the 360s. He could not pay bail or

post bond. Plaintiff was in effect unable to secure his own release by any means despite the fact that the First Capias contemplated that he would have the ability to do so.

156.    In addition, Defendant inexplicably booked Plaintiff in to the prison on a third degree felony, a crime which carries a sentence of no less than 2 years. Defendant had no basis to do this. Neither of the Capias warrants that were issued charge Plaintiff with any criminal offense. *See* Tex. Code Crim. P. Art. 23.02(3).

157.    Defendant knew or should have known that in order to arrest a defendant on a felony charge pursuant to a Capias for a failure to appear, the underlying offense for which the defendant's appearance was required must be classified as a felony and the felony offense must be stated in the Capias. *See* Tex. Penal Code § 38.10(f); Tex. Code Crim. P. Art. 23.02(3).

158.    Even if Defendant could not be reasonably expected to know his obligations under the Texas Penal Code the Texas Code of Criminal Procedure, he had no reason to believe that the underlying offense committed by Plaintiff was a felony, let alone a criminal offense, based on the directives in the First Capias and Second Capias, or otherwise. Neither Capias in fact lists the State of Texas as a party or identifies any criminal charge. Defendant had no grounds to incarcerate Plaintiff as a felon.

159.    By failing to follow basic criminal procedure and exercise reasonable discretion to ensure that that the Capias warrants were carried out as directed, Defendant violated Plaintiff's constitutional right to due process of law under the Fourteenth Amendment.

160.    Plaintiff has a constitutional right to his personal liberty and he was deprived of that right for five days due to Defendant's actions. He was able to secure his own release only after he petitioned the Texas Court of Appeals for a writ of habeas corpus. The Texas Court of Appeals

eventually issued the writ, holding that Plaintiff's incarceration was improper and violated established Texas Supreme Court precedent.

161.     Defendant cannot claim qualified immunity as a defense. Qualified immunity does not protect a government official where his or her actions violate clearly established constitutional rights of which a reasonable person would have known. There is no question that Defendant knew or should have known that he needed to bring Plaintiff to court instead of prison because this is the action that the First Capias requires.

162.     There is also no question that Defendant knew or should have known that he needed to do more than simply drive Plaintiff to prison and leave him there. The First Capias requires that he only be taken to jail "until" he complied with the court orders and Defendant simply did nothing to address this directive in the Capias.

163.     Defendant knew or should have known that by ignoring the directives in the First Capias and/or Second Capias he would be committing an unlawful seizure and denying Plaintiff due process of law. It is an act of pure incompetence to ignore these directives either intentionally or negligently.

164.     Defendant also most certainly knew that he could not book Plaintiff in to the prison on a third degree felony. There was absolutely no basis to believe that Mr. Stroffolino committed a felony.

165.     By being illegally and wrongly arrested and incarcerated on a third degree felony charge and deprived of his liberty in violation of his constitutional rights under the Fourth and Fourteenth Amendment, Mr. Stroffolino sustained damages in the amount of $25,000.

## THIRD CLAIM FOR RELIEF

**PETITION TO VACATE ARBITRATION AWARD UNDER 9 U.S.C. § 10(a)**

**(by THM as Petitioner; HealthSpring as Respondent)**

166.     The Court may vacate an arbitration award where (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators, or either of them; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a). In addition to these statutory grounds, vacatur is appropriate where the arbitrators acted with manifest disregard of the law. *See Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).

167.     The outcome of the Arbitration in this case is shocking and the Final Award ought to be immediately vacated. THM entered emergency arbitration as an intact business seeking to protect itself from a multi-billion dollar company that refused to honor a contract. THM exited arbitration with its entire business wiped out. The Tribunal found that THM repudiated the contract by attempting to remain in business, and on this basis awarded HealthSpring $737,250.00 in contract damages, $69,779.56 in arbitration fees and an order of specific performance requiring THM to turn over the Forms. The Tribunal did not find any fault with HealthSpring's actions and HealthSpring was relieved of all of its obligations under the contract. This result is absolutely appalling.

168.     The actions taken by the Tribunal in reaching the Award betray wrongdoing of

enormous magnitude. There were no less than 10 acts of misconduct, and they are so pervasive and severe they meet the criteria for four of the five grounds for vacatur. These transgressions were deliberate, malicious and aimed solely at THM. After reviewing the arguments and the overwhelming supporting evidence, this Court should find that vacatur in this case is entirely warranted.

## THE ARBITRATORS WERE PARTIAL TO HEALTHSPRING

169.    To vacate an award based on evident partiality, a court must find that a "reasonable person would have to conclude" that the arbitrator was partial to one of the parties. *Applied Indus. Materials Corp. v. Ovalar*, 492 F.3d 132, 137 (2nd Cir. 2007); *Morelite Const v. NYC Dist. Council Carpenters*, 748 F.2d 79, 84 (2nd Cir. 1984). Such conclusion can be inferred "from objective facts inconsistent with impartiality." *Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 n. 2 (2d Cir. 1986). However, a finding of partiality "may not be based simply on speculation." *See Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 530 (4th Cir. 2007).

170.    There is no question that the arbitrators, particularly Mr. Appel, were biased against THM.  As an initial matter, while serving as an arbitrator in this case, Mr. Appel was being paid by HealthSpring's parent company Cigna to serve as the sole arbitrator in another matter (Dkt. No. 7, Ex. 23).  HealthSpring also gave all three arbitrators free drinks and meals every day of the hearing (Dkt. No. 7, Ex. 21, at p. 5).

171.    These financial incentives suggest a material conflict of interest that Mr. Appel was predisposed to favor HealthSpring in the Arbitration.  *See Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.*, 668 F. 3d 60, 76 (2nd Cir. 2012).

172.    Bias can also be inferred from the acts taken by the Tribunal which are inconsistent with neutrality. *See, e.g., Thomas Kinkade Company v. White*, 711 F.3d 719, 724 (6th Cir.

2013)(partiality established by a convergence of undisputed facts); *Ruhe v. Masimo Corp.*, 14 F. Supp. 3d 1341, 1348 (C.D. Cal. 2014). In particular, the Tribunal's Interim Ruling granted HealthSpring the ultimate relief it was seeking in the case without any assessment of the merits or irreparable harm (Dkt. No. 7, Ex. 22, at p. 4).

173.    The Tribunal repeatedly and inexplicably refused to reverse the order after it became abundantly clear that the issue giving rise to the need for immediate action no longer applied. The Tribunal failed to act knowing full well that by remaining idle Mr. Stroffolino could be arrested by the Collin County Sheriff at any time for failing to turn over THM's property. No impartial arbitrator would act in this manner.

174.    There is also nothing impartial about any of Mr. Appel's procedural rulings. Two of them in particular are especially troubling because they deprived THM of its right to counsel. THM's majority member, Mr. Stroffolino, was ordered not to communicate with legal counsel during the evidentiary hearing. THM's members were required to be deposed in person without counsel physically present. These restrictions are severe and unwarranted, particularly since they did not apply at all to HealthSpring.

### THE INTERIM RULING REVEALS THE TRIBUNAL'S BIAS

175.    The Tribunal's bias against THM is evident in the Interim Ruling. Despite the fact that possession of the 360s was the ultimate relief HealthSpring was seeking in the Arbitration, the Tribunal ordered THM to deliver them to HealthSpring.

176.    The Tribunal did this without ruling on the breach of contract claim that would allow for this relief. In effect, the Tribunal handed HealthSpring a final award without the need to prevail on its claim.

177.    In the decision, the Tribunal noted that action was necessary because the potential

value of the 360s would be "entirely dissipated" if HealthSpring were unable to submit data to CMS prior to January 31, 2018 (Dkt. No. 7, Ex. 22, at pp.1-4). The Tribunal claimed that "the Forms have significant value to HealthSpring" because the data in them could potentially be used to obtain payments from CMS (Dkt. No. 7, Ex. 22, at pp. 3-4).

178.    The Tribunal determined that it was necessary for THM to turn over the 360s so that HealthSpring could submit the data and thus potentially obtain a significant cash payment from CMS (Dkt. No. 7, Ex. 22, at p. 5). The Tribunal characterized this decision as "an interim measure akin to protecting and conserving property and its attendant value, and to prevent that property and value from dissipating" (Dkt. No. 7, Ex. 22, at pp. 4-5). *See* AAA Commercial Rule R-37(a).

179.    But the Tribunal failed to explain how depriving THM of its assets so that HealthSpring can potentially profit from them protects or conserves property. The Tribunal did not examine the merits of the underlying breach of contract claim or evaluate any evidence of irreparable harm, an analysis which is essential to establishing the need for a pre-decision remedy and the appropriateness of equitable relief. *See Yahoo! Inc.v. Microsoft Corp.*, 983 F. Supp. 2d 310, 319 (S.D.N.Y. 2013); *Southern Seas Navigation Ltd. of Monrovia v. Petroleos Mexicanos of Mexico City*, 606 F. Supp. 692, 694-95 (S.D.N.Y. 1985)(noting that a grant of interim relief is dependent on an appraisal of the merits and a finding of irreparable harm).

180.    The Tribunal's failure to make any finding on irreparable harm is particularly troubling because HealthSpring's position throughout the Arbitration had been that its losses are quantifiable to the dollar as damages.

181.    As stated in HealthSpring's Pre-Hearing Brief:

On its claim for breach of contract, HealthSpring seeks recovery for the 16,424 360 Assessment forms that THM failed to return and for which HealthSpring could not

submit for reimbursement to CMS.  At $295 per form, HealthSpring's damages total $4,845,670. Alternatively, HealthSpring seeks the return of the 360 Assessment forms….

(Dkt. No. 7, Ex. 32, p. 51). These damages were also detailed in a demonstrative exhibit produced by HealthSpring (Dkt. No. 7, Ex. 33).

182.     The first time HealthSpring raised the issue of lost profits was on the second-to-last day of the hearing (Dkt. No. 7, Ex. 46, at Tr. 1761:22-1762:7). HealthSpring never produced a shred of evidence during the hearing to support a finding on lost profits or even requested them in the prayer for relief in its Answering Statement.

183.     The closest the Tribunal came to addressing irreparable harm was its determination that the 360s "are the potential basis for substantial payments" and that the value of the 360s was in danger of being "entirely dissipated" (Dkt. No. 7, Ex. 31). But these conclusions are completely arbitrary. HealthSpring's witnesses in fact testified that the potential for substantial payments was a matter pure speculation:

> ARBITRATOR APPEL: …. And bear in mind that if they get the forms, as I understand it there'll be several million -- as we understand it, and there will be several millions of dollars coming from CMS in as payment. And that money --
>
> DR. FESSENDEN: That's not the – that may or may not be true.
>
> MS. USELTON: I don't think that's accurate. So the -- I don't know, yeah.
>
> DR. FESSENDEN: …. So in other words, if we've already collected the data that we're able to get off the -- if we collected all the data through claims or other sources rather than the THM 360 form, it's not going to increase revenue….
> ….
> HON. HARRIS: But all of that is speculation, right, at this point?
>
> DR. FESSENDEN: That's what I'm saying.

(Dkt. No. 7, Ex. 46, at Tr. 1763:9-1767:8-10). The Tribunal deliberately ignored the undeniable fact that the 360s could have no value at all. *See Winter v. Natural Resources Defense Council, Inc.*, 29 S. Ct. 365, 376 (2008).

184.     Clearly, the Tribunal's decision was not motivated by any concern to protect or conserve property but rather a desire to ensure that HealthSpring obtained the 360s regardless of the outcome of the case.

185.     This conclusion is not only supported by the language in the decision itself, but also the actions of the Tribunal following the issuance of Interim Ruling. After the Tribunal was informed that HealthSpring had been paid by CMS on most of the data in the Forms, it knew that that the value of the 360s would not be "entirely dissipated."

186.     Yet despite this knowledge it refused to reverse the Interim Ruling or even require HealthSpring to explain the extent to which it had already been paid on the 360 data.  Instead, the Tribunal simply denied THM's request without providing any rationale (Dkt. No. 7, Ex. 26).

187.     It could have very well been the case that HealthSpring had already reaped profits on all 360s, thus dispensing of the need for Interim Ruling altogether (Dkt. No. 7, Ex. 22, at p. 1). But the Tribunal did not conduct any inquiry at all.

188.     These actions are not consistent with impartiality. The Interim Order divested THM of the right to possess property which it claimed to own, and no neutral arbitrator would be apathetic to THM's property rights.

189.     Even if the Tribunal's failure to re-visit its ruling was somehow justified, its refusal to overturn the ruling after the deadline had extended was not. The purpose of the Interim Ruling was to preserve potential profits by allowing HealthSpring to submit data from the 360s to CMS by January 31, 2018.  But on January 26, 2018, this deadline was extended to May 4, 2018, more than 7 weeks after the decision date in the case (Dkt. No. 7, Ex. 22).

190.     There was no longer a pressing deadline and absolutely no danger that any profit remaining in the Forms would be lost. No reasonable person could possibly believe that the Interim

Ruling served any legitimate purpose after January 26, 2018.

191.    The Tribunal's failure to act shows a clear desire to inflict harm on THM. The Tribunal knew that THM was suffering from the effects of the ruling.

192.    In its request to reverse the Interim Ruling, THM advised the Tribunal as follows:

> This morning in [the Texas District Court] HealthSpring would not consent to lift the contempt order against THM. Consequently, THM remains in contempt and Mr. Stroffolino must produce the forms by March 23, 2018 or else sit in a holding cell until the forms are produced. This is grossly unjust and does not serve the underlying purpose of Order No. 6 to conserve value....With this order HealthSpring is able to use jail time for Mr. Stroffolino as a way to guarantee that the forms will be turned over prior to the final decision and regardless of what the outcome of this arbitration may be. Such abuse of the court system should not be tolerated.

(Dkt. No. 7, Ex. 29).

193.    The Tribunal expressed no concern whatsoever, finding that "Order No. 6 is part of the record of this arbitration and the Panel sees no reason it should be withdrawn and not remain part of the record" (id.). In other words, the Tribunal refused to reverse the order simply because it did not want to do so.

194.    That the Tribunal would allow Mr. Stroffolino to remain in contempt and potentially imprisoned on account of a ruling that served no purpose is atrocious. One can only conclude that the conservation and protection of property was not the purpose of the ruling.

195.    It is evident that the Tribunal ruled the way it did either because the arbitrators (1) had already decided the case in HealthSpring's favor or (2) wanted HealthSpring to profit from THM's property regardless of the outcome in the case. Either way, partiality is evident, and this is underscored by the fact that the Tribunal was indifferent to the harm being inflicted on THM[6].

---

[6] The Tribunal's actions also point to bias when the decision of Emergency Arbitrator Daniels is taken into account. When THM's business was teetering on disaster Mr. Daniels did not bother to even address the need to protect and conserve THM's business (Dkt. No. 7, Ex. 8 at pp. 7-8). But here the Tribunal went out of its way to protect and conserve HealthSpring's profits. Clearly HealthSpring was afforded far more favorable treatment than THM had received under similar circumstances during the emergency proceeding.

## MR. APPEL'S REFUSAL TO ALLOW THM TO ACCESS LEGAL COUNSEL REVEALS PARTIALITY TOWARDS HEALTHSPRING

196.    There are two procedural decisions by Mr. Appel which show a strong leaning towards HealthSpring since they cannot be rationally explained.  First, during the evidentiary hearing Mr. Appel ruled that Mr. Stroffolino could not communicate with THM's counsel. Second, Mr. Appel made a pre-hearing discovery ruling that made it impossible for THM's counsel to attend depositions in person. It is undeniable that these decisions afforded HealthSpring an unfair advantage in the case. *See*, *e.g*., *Thomas Kinkade*, 711 F. 3d at 724.

## MR. STROFFOLINO WAS UNFAIRLY DENIED THE ABILITY TO COMMUNICATE WITH THM'S COUNSEL

197.    Mr. Appel acted with prejudice against THM by ordering Mr. Stroffolino not to have any contact with THM's legal counsel during the break between evidentiary hearing days. At the end of the first day of the hearing, the following exchange occurred:

MR. LECKERMAN: Now, can we instruction the witness and Mr. Cutler, now that the cross-examination started, that they should not be talking, e-mailing and conferring in any way while the cross-examination's open.

ARBITRATOR APPEL: Yes. You heard that Mr. Stroffolino? You're not to –

THE WITNESS: Yes –

ARBITRATOR APPEL: -- you're not to discuss the testimony with Mr. Cutler.

MR. LECKERMAN: Or I suppose Mr. Sloan.

ARBITRATOR APPEL: Or anyone else, neither past testimony, nor testimony to be given in the future.

(Dkt. No. 7, Ex. 40, Tr. 273:18-273:8).

198.    Mr. Stroffolino was thus unable to communicate with THM's legal counsel while he testified between October 23, 2017 and October 27, 2017.  This in and of itself is outrageous. Mr. Stroffolino beneficially owned 66% of the equity of THM and was its highest ranked executive

officer. He was not just a representative of the company; as the controlling member of the company he was, in essence, the company itself.  It is well-established that a company has a due process right to communicate with legal counsel, even during recesses on cross-examination. U.S. Const. amend. XIV, § 1; Fed. R. Evid. 615; *see Geders v. United States*, 425 U.S. 80, 96, S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Potashnick v. Port City Const. Co.*, 609 F. 2d 1101, 1118 (5th Cir. 1980). It was improper for Mr. Appel to deprive THM of this fundamental right (id.). Mr. Appel did not even give THM the opportunity to respond before ruling on the matter.

199.    But even more troubling than Mr. Appel's derogation of THM's Fourteenth Amendment rights is the fact that Mr. Appel did not apply his ruling equally to witnesses at HealthSpring.  Under AAA Commercial Rule R-32, Mr. Appel had an obligation to ensure that the parties are treated equally and that "each party has the right to be heard and is given a fair opportunity to present its case."  Mr. Appel blatantly disregarded this requirement.

200.    The record reflects that he never instructed any HealthSpring witness at any time to refrain from having contact with HealthSpring's legal counsel. HealthSpring witnesses were present almost every day of the hearing and they were accompanied at all times by legal counsel, even during cross-examination (Dkt. No. 7, Ex. 44, at Tr. 1073:1-11; 1375:1-14; 1781:1-11).

## HEALTHSPRING WAS PERMITTED TO DEPOSE THM'S WITNESSES WITHOUT COUNSEL PHISICALLY PRESENT

201.    Order No. 1 provides that "[e]ach party may conduct two fact witnesses depositions for up to four hours per deposition" (Dkt. No. 7, Ex. 13, at ¶ 10(g)). On July 7, 2017 HealthSpring provided notices of deposition to THM's managing director and majority member, Mr. Joseph Stroffolino, and to THM's Vice President – Technology and Logistics, Mr. Wade Sloan.

202.    These depositions were scheduled to be conducted in New York City on July 25, 2017. However, THM objected to the locale because THM could not afford to pay the

transportation costs for Mr. Stroffolino and Mr. Sloan (who are located in the Dallas metropolitan area) to travel to New York City.

203.    THM proposed that the depositions be conducted by videoconference, with HealthSpring's counsel (who is located in Philadelphia) and THM's counsel (who is located in the New York metropolitan area) both physically present at a single location in New York City. THM believed that this was a fair solution because it was anticipated that the witnesses would testify (and they did in fact end up testifying) at the hearing by video conference with the attorneys present in New York City. The witnesses therefore would be providing deposition testimony in the same way they would be testifying during the hearing.

204.    This solution was unacceptable to HealthSpring. On July 11, 2017, HealthSpring issued new deposition notices for Mr. Stroffolino and Mr. Sloan with the depositions scheduled to be conducted in Dallas.  THM objected to the locale on the same grounds as before, namely that it could not afford transportation costs. Although Mr. Stroffolino and Mr. Sloan could attend the depositions in person, THM could not afford to pay the transportation costs of THM's counsel to travel to Dallas, Texas. Thus THM's counsel would be unable to attend the depositions in person.

205.    HealthSpring's counsel informed Mr. Appel of the issue by email on July 14, 2017 and asked that he permit HealthSpring to depose Mr. Stroffolino and Mr. Sloan in person in Dallas notwithstanding the fact that THM could not afford the travel costs of counsel. THM again objected, but Mr. Appel ruled that "HealthSpring's proposal that the depositions be conducted in Texas, the location of the witnesses, with Mr. Cutler being able to participate by videoconference, is a reasonable one" (Dkt. No. 7, Ex. 16).

206.    On the day of the depositions, HealthSpring's counsel was physically present alone with each THM witness in a conference room for approximately 4 hours. To the extent that

HealthSpring's counsel may have interacted with THM's witnesses outside of the conference room is unknown because THM's counsel was not physically present.

207.    To make matters worse, THM's counsel was unable to access videoconferencing equipment on the day of the depositions and therefore had no choice but to attend by way of teleconference. THM's counsel could not see the witnesses or HealthSpring's counsel.  THM's witness were left to fend for themselves.

208.    Mr. Appel's ruling was without question slanted in favor of HealthSpring. Mr. Appel simply chose to ignore the fact that THM could not pay the transportation costs, and he did not consider the repercussions of THM being unable to attend the depositions in person.

209.    This was improper. In making evidentiary decisions Mr. Appel was required to "take into account applicable principles of legal privilege such as those involving the confidentiality of communications between a lawyer and a client." AAA Commercial Rule R-34(c). He obviously did not make any such assessment in his ruling.  He did not consider the fact that the risk of disclosing privileged information would be significantly higher if THM's counsel were not physically present.

## MR. APPEL PREVENTED THM FROM OBTAINING MATERIAL EVIDENCE

210.    An award may be vacated where the arbitrators refused to hear evidence pertinent and material to the controversy. 9 U.S.C. § 10(a)(3).  The courts have interpreted this standard to mean that the arbitrators cannot violate "fundamental fairness" in conducting the arbitration. *Kolel Beth Yechiel Mehil of Tartikov, Inc. v. YLL Irreovcable Trust*, 729 F.3d 99, 107 (2nd Cir. 2013); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2nd Cir. 1997). This does not mean that the arbitrators must hear all of the evidence, but it does mean that the arbitrators must give each party an adequate opportunity to present its evidence and argument. *Id*.

211.    Here, the Tribunal, and in particular Mr. Appel, denied THM's right to fundamental fairness in two significant ways.  First, during discovery Mr. Appel denied THM access to the pricing information in HealthSpring's contracts with Alegis and other 360 Assessment providers (Dkt. No. 7, Ex. 15). This evidence was material to THM's Sherman Act claim in that it could prove that HealthSpring acted with monopolistic intent in forcing THM out of business. Because THM was denied this evidence, THM was unable to meet its burden of proof and therefore had no choice but to withdraw the claim.

212.    Second, Mr. Appel improperly interfered with the examination of witnesses.  He interrupted THM's cross-examination to answer questions for the witnesses and raise arguments that were detrimental to THM's case.  These interruptions were highly prejudicial as they had the effect of tainting the witnesses and the other arbitrators.  They were especially damaging because they occurred at important points in the questioning.

## THM WAS DENIED ACCESS TO PRICING TERMS THAT WERE MATERIAL TO THM'S SHERMAN ACT CLAIM

213.    In its Demand for Arbitration, THM asserted a claim against HealthSpring for attempted monopolization under Sherman Act § 2 (15 U.S.C. § 2). In order to succeed on this claim, THM was required to establish the following elements: (1) That the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, thereby creating (3) a dangerous probability of achieving monopoly power. 15 U.S.C. § 2.

214.    The crux of THM's claim was that HealthSpring attempted to establish a monopoly for the performance of third party annual health risk assessments for Medicare Advantage plans in Houston, Texas.  THM alleged that HealthSpring enrolled more than 20% of the Medicare Advantage beneficiaries in Houston and had the absolute power to choose who would perform health risk assessments for these plan members (Dkt. No. 7, Ex. 18, at p. 6).

215.    THM further alleged that Alegis, an affiliate of HealthSpring, operated a business that competed with THM, and that in 2015 and 2016 HealthSpring re-directed to Alegis a significant volume of business within the plan that otherwise would have been distributed to THM (Dkt. No. 7, Ex. 18, at p. 3).  THM asserted that HealthSpring did this for the anti-competitive purpose of acquiring a dominant share of the business within the plan and eliminating competition from THM and other providers for business in Houston outside of the plan (Dkt. No. 7, Ex. 10, Supplemental Statement, at pp. 5-6). THM's position was that HealthSpring's manipulation of business volume forced THM out of business.

216.    In order to prove HealthSpring's monopolistic intent, THM intended to show that HealthSpring had no legitimate business purpose for diverting business volume to Alegis. THM believed that HealthSpring paid a significantly higher price to Alegis to perform a 360 Assessment as compared to THM and other providers within the health plan, and that the quality of Alegis' work product was extremely poor as compared to other providers (Dkt. No. 7, Ex. 18, at p. 3).

217.    In order to substantiate its belief, THM submitted the following document request during discovery:

> Other than the Agreement between Respondent and Claimant, copies of all contracts executed on or after January 1, 2013 by Respondent or any of its affiliates with any health assessment provider (excluding THM and PCPs that are not Alegis-managed medical practices) that relate to the performance of health risk assessments in Texas, Arizona or any state in which Alegis does business.

(Dkt. No. 7, Ex. 34, ¶ 2).

218.    But HealthSpring objected to this request on the grounds that the contracts contained sensitive business information.  THM opposed the objection because it was out of business, a non-disclosure protective order was in place and the information was needed to support its Sherman Act claim.

219.    Mr. Appel addressed the issue during a discovery hearing.  He allowed HealthSpring to produce the contracts with "commercially sensitive terms" redacted, apparently in agreement with HealthSpring's argument that THM might somehow misuse the information (Dkt. No. 7, Ex. 15).

220.    Even if this were a valid concern, Mr. Appel had no authority to exclude evidence solely on the basis of business concerns. Under the AAA Commercial Rules an arbitrator may only exclude evidence that is "cumulative or irrelevant." AAA Commercial Rule R-34(b). It cannot possibly be said that the prices paid to a competitor within the market is irrelevant or cumulative in the context of an anti-trust claim.

221.    THM's inability to access the pricing terms made it impossible to proceed with the Sherman Act claim. As THM noted in its letter brief opposing HealthSpring's request for summary disposition, the courts have held that a specific intent to monopolize can be inferred where a competitor is driven out of business (Dkt. No. 7, Ex. 15, at p.5). *See Steward Health Care v. Blue Cross & Blue Shield*, 997 F. Supp. 2d 142, 154-155 (D.R.I. 2014).

222.    However, while THM was driven out of business in this case, the parties disputed whether HealthSpring was the cause. THM therefore needed additional evidence to conclusively establish that HealthSpring's actions were driven by monopolistic intent.

223.    The pricing information would have revealed that HealthSpring was paying a substantially higher rate to Alegis than to THM and other competing providers, and thus the only purpose for re-directing such a large volume of business to Alegis was to expand Alegis' business and weed out competitors within the health plan.  *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993) (noting that existence of unfair or predatory tactics may be sufficient by itself to prove an intent to monopolize).

224.    Because THM was unable to obtain this pricing information, THM lacked sufficient evidence to prove monopolistic intent by a preponderance of the evidence. Mr. Appel's decision thus precluded THM from pursuing the claim.

## THE TRIBUNAL, IN PARTICULAR MR. APPEL, IMPROPERLY INTERFERED WITH THE EXAMINATION OF WITNESSES.

225.    During the evidentiary hearing, Mr. Appel repeatedly interfered with THM's questioning of witnesses.  He answered questions for the witnesses, led them to change their answers and expounded on their answers.  He tainted the witnesses and the other arbitrators, and in doing so denied THM a fair opportunity to present its case.

226.    Some of the most shocking instances of interference occurred during the cross-examination of Dr. Fessenden on the issue of whether HealthSpring breached the covenant of good faith and fair dealing by withholding business volume in January 2017. This was a significant claim in the case.

227.    In one instance, THM attempted to establish that HealthSpring knew that THM was dependent on it for business and that by withholding business volume HealthSpring knew or should have known that it would be forcing THM out of business (and therefore making it impossible for THM to perform the contract).

228.    Dr. Fessenden's testified that he was aware THM needed the revenue to pay its employees but he thought that THM could have had other lines of business and sources of revenue (Dkt. No. 7, Ex. 46, at Tr. 1881:20-1882:8; 1885:10-13).  THM's counsel asked Dr. Fessenden how HealthSpring could believe this when THM was relying on the revenue from HealthSpring specifically to cover its operating expenses (Dkt. No. 7, Ex. 46, at Tr. 1885:14-17).

229.    But before Dr. Fessenden could answer the question, Mr. Appel interrupted and stated "[h]e didn't say you [sic] had reason to believe. He said he didn't know whether they were

doing business with 50 other customers or not." Mr. Appel then proceeded to answer the question for Dr. Fessenden by stating "he didn't know if the prepayment was intended to deal with this line of [THM's] business and he was separating it from potential revenue in other – that other customers provided" (Dkt. No. 7, Ex. 40, at Tr. 1886:7-11). He then proceeded to expound on his own answer:

> ARBITRATOR APPEL: I think he was saying that it's possible for internal financial purposes that THM might have had, that it was trying to get a self-sustaining operation just related to these customers. Even if it was making money hand over fist on somebody else, they still -- THM still wanted to get money coming in on a cash-flow basis that would have sustained the THM -- the HealthSpring business. I think that's the gist of what he was testifying to.
>
> THE WITNESS: That is correct.

(Dkt. No. 7, Ex. 46, at Tr. 1886:14-1887:1).

230.    Mr. Appel's actions are reprehensible. He compromised the integrity of Dr. Fessenden's testimony, disrupted THM's line of questioning and prevented THM from eliciting a candid response to the question.  He advocated for HealthSpring and tainted the witness and the other arbitrators on the panel. These are not actions that are appropriate for a neutral arbitrator.

231.    In another instance on cross-examination, THM's counsel asked Dr. Fessenden if at the time of THM's filing of the Rule R-38 Application he knew that THM had the ability to continue performing the contract.

232.    Again, before Dr. Fessenden could answer the question, Mr. Appel interrupted to provide an answer, stating that "[y]ou're asking did he know that they could still stay in business. Your own letter, one reading this could think the next day you were going to go up in a cloud of smoke" (Dkt. No. 7, Ex. 46, at Tr. 1794:10-14).  Mr. Appel then proceeded to attack THM's position that THM could have continued to perform the contract at the time the Rule R-38 Application was filed:

> ARBITRATOR APPEL: But you were doing that, asking for payment of invoices that they said you weren't entitled to and they weren't going to pay.

MR. CUTLER: I don't know what that -- the point that we were –

ARBITRATOR APPEL: You were saying unless we get paid for the invoices, that HealthSpring contended you were not even entitled to, you were going to go out of business.
….

MR. CUTLER: What we were saying is that if they didn't pay -- in fact, I think it's in the R38 application, was that if they don't pay going forward, we will go out of business. That's what we were trying to say. I don't think we say anywhere in any of these papers that we were going out of business.

ARBITRATOR APPEL: Well, I mean maybe we're just engaging in legal argument and contentions, but when you say we're going to lay off, our expenses, we can't meet payroll on February 3rd, we lack sufficient funds to pay other operating costs. Without the ability to pay these costs, we will be forced to abandon our corporate office, lay off our entire staff, and terminate our business and the business of our affiliates.

MR. CUTLER: That was in the -- the, what, the demand?

ARBITRATOR APPEL: Yeah. That's a pretty huge signal that you're going to be out of business.

MR. CUTLER: But –

ARBITRATOR APPEL: What day that was going to happen isn't entirely clear, but given that it's an emergency proceeding, I think it's a fair implication that this was imminent.

(Dkt. No. 7, Ex. 46, at Tr. 1994:19-1996:13).

233.    Mr. Appel's argument with THM's counsel was highly inappropriate, especially since it was during THM's cross-examination. In the presence of the witness and the full panel of arbitrators, Mr. Appel challenged the strength of THM's case and the point that THM was trying to establish with the witness (i.e. that Dr. Fessenden was aware THM could have performed the contract).  He distracted the arbitrators and cast a negative light on THM's request for emergency relief.

234.    This further tainted the other arbitrators and compromised the integrity of Dr.

Fessenden's testimony.  The prejudicial effect in this instance is clearly visible, as the Tribunal eventually found that THM through its words and actions in January and February 2018 conveyed an unwillingness or inability to perform the contract (Dkt. No. 7, Ex. 31, pp. 23-24).

235.    In another instance of interference, Mr. Appel convinced Dr. Fessenden to change his answer on the critical issue of whether he understood that the Amendment continued to provide for separate pricing for HMRs and Labs. Dr. Fessenden at one point testified that the Amendment entirely overwrote the 2013 Agreement, a position which was inconsistent with his prior testimony (Dkt. No. 7, Ex. 46, at Tr. 1814:9-17). THM then asked him to explain his answer but before Dr. Fessenden could answer, Mr. Appel interrupted by stating "[t]hat's not what he said. He said he thought it replaced Exhibit B [to the 2013 Agreement]" (Dkt. No. 7, Ex. 46, at Tr. 1814:9-1815:20). Dr. Fessenden then changed his answer to say that he believed the Amendment changed on "that specific payment around what services were provided and how those would be paid for" (Dkt. No. 7, Ex. 46, at Tr. 1814:9-1815:20). Mr. Appel thus prevented THM from probing Dr. Fessenden on his inconsistent testimony and challenging his credibility as a witness.

236.    Mr. Appel also interfered during the cross-examination of other witnesses on material issues. One such issue was whether HealthSpring acted with bad intentions in failing to distribute business volume that it was holding at the end of 2016.  The Tribunal ultimately found in the Award that HealthSpring did not act with "a dishonest purpose, consciousness of wrong or ill will in the nature of fraud" (Dkt. No. 7, Ex. 30, at p. 19).

237.    On this issue, THM had asked Ms. Stevens why 10,000 undistributed member names had not been distributed to THM at the end of 2016. Mr. Appel interrupted the questioning and stated "[t]hat doesn't make sense because the 10,000 names…were distributed in the fourth quarter or some portion of them." He then proceeded to answer the question for Ms. Stevens by

stating without any basis that "[s]ome portion [had been distributed] after scrubbing and so on" (Dkt. No. 7, Ex. 45, at Tr. 1737:3-14). Mr. Appel not only tainted Ms. Stevens but also called into question THM's position that HealthSpring had purposely withheld business volume.

238.    Mr. Appel also interrupted the cross-examination of Ms. Tatum Williams on the critical issue of whether HealthSpring was aware that THM was coding HMRs.  Initially Ms. Tatum-Williams testified that "[o]n the 360 form, there are ICD-10 codes, yes." But then later on Mr. Appel convinced her to change her answer:

> ARBITRATOR APPEL: And just to clarify, Mr. Cutler just talked about medical record and asked you about who prepared that. And I think you made a statement in your testimony that, in an answer to one of his questions, that the medical record contains the codes. Did you say that? And if so, did you mean -- and if so did you mean it?
>
> THE WITNESS: No, the medical record contains the diagnostic statement.
>
> ARBITRATOR APPEL: Right.
>
> THE WITNESS: It should.
>
> ARBITRATOR APPEL: I know.

(Dkt. No. 7, Ex. 41; at Tr. 515:3-8; 515:21-516:6; 533:1-13).

239.    There are numerous other examples of Mr. Appel corrupting witness testimony, but it would be impractical to address them all in this Memorandum[7].  The bottom line is that Mr. Appel disrupted the information-gathering process during the evidentiary hearing, and prevented THM from obtaining evidence that was relevant to key issues in the case, including the issue of HealthSpring's bad faith intentions in withholding business volume and HealthSpring's understanding of the contract terms.

240.    To deny THM the ability to obtain this evidence is fundamentally unfair. It is

---

[7] See, e.g., Dkt. No. 7, Ex. 46, at Tr.  1949:16-1950:19 (argument with THM's counsel during cross-examination); Tr. 1987:17-1989:1 (answering for Dr. Fessenden); id. at Tr. 2012:12-2013:20 (answering for Dr. Fessenden); id at Tr. 2030:19-2031:8 (expounding on Dr. Fessenden's answer); Ex. 45, at Tr. 1660:6-12 (answering for Ms. Stevens).

especially improper because Mr. Appel's interruptions were aimed solely at discrediting THM's case. There is in fact not a single instance on the record of Mr. Appel answering questions for any witness during HealthSpring's cross-examination of THM witnesses or of arguments between himself and HealthSpring's counsel in the presence of the other arbitrators or any witness.

## THE ARBITRATORS EXCEEDED THEIR POWERS BY TAKING ACTIONS THAT CONTRAVENED THE BSA AND THE AAA COMMERCIAL RULES.

241.    Another basis for vacatur is where the arbitrators exceeded the scope of their powers under the contract or the arbitration rules. See 9 U.S.C. § 10(a).  In order to satisfy this standard the arbitrators must have either (1) considered issues outside those submitted to them by the parties for consideration, or (2) reached issues prohibited by law or the parties' agreement. *See Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011).

242.    In this case the arbitrators exceeded their powers in four ways. First, they improperly delegated to Mr. Appel the discretionary authority to make all decisions on behalf of the Tribunal, which was a clear violation of the BSA.

243.    Second, they awarded HealthSpring specific performance, a form of relief that is not available under the BSA. Third, they awarded HealthSpring fees that the arbitrators claimed THM owed to the AAA, an award that contravenes the indemnification provisions in the BSA. Fourth they re-decided issues that had been resolved by Emergency Arbitrator Daniels in the Rule R-38 proceeding.

## THE ARBITRATORS IMPROPERLY DELEGATED TO MR. APPEL THE AUTHORITY TO SIGN ORDERS AND MAKE DECISIONS ON BEHALF OF THE ENTIRE TRIBUNAL.

244.    The arbitrators exceeded their powers by delegating to Mr. Appel the power to sign all orders on behalf of the Tribunal and thereby make all decisions on behalf of the Tribunal.  These actions were prohibited by the terms of the BSA and the AAA Commercial Rules.

245.    The delegation of power to sign documents was referenced in Order No. 1. The Tribunal ruled that "upon agreement of the Tribunal, orders of the Tribunal may be signed by the Tribunal Chair on behalf of the entire Tribunal and shall be effective as if signed by all three Tribunal members" (Dkt. No. 7, Ex. 13, at ¶ 25).

246.    This ruling, however, conflicts with the provisions of Section 9(f) of the BSA. These provisions provide that disputes between the parties must be "resolved in accordance with the Commercial Rules of the American Arbitration Association." This means that the Tribunal was required to comply with *all* of the AAA Rules in resolving the dispute. *See Kashner Davidson Securities Corp. v. Mscisz,* 531 F. 3d 68, 77 (1st Cir. 2008)(finding that arbitrator may not ignore the plainly stated procedural rules incorporated in the agreement).

247.    These rules included Rule R-44(a), which requires a majority of the arbitrators to make all decisions.  They also included Rule R-46(a), which requires every award to be signed by a majority of the arbitrators.

248.    Mr. Appel's ability to execute all signatures was thus improper because it empowered a single arbitrator to act on behalf of the entire Tribunal in violation of AAA Commercial Rules R-44(a) and R-46(a). *See Lefkovitz v. Wagner*, 291 F. Supp. 2d 764, 772 (N.D. Ill. 2003) (noting that "arbitrators may not delegate their duties"). Mr. Appel through his signing authority had the power to make all decisions on behalf of the Tribunal because his signature alone on any order rendered the order "effective as if signed by all three Tribunal members." His decision-making authority was not limited in any way and thus extended to any orders of any kind, even awards that required the signatures of a majority of the arbitrators under Rule R-46(a).

249.    In essence Order No. 1 gave Mr. Appel *carte blanche* to exercise the full power of the Tribunal on any decisions, a power which he could not exercise under the AAA Commercial

Rules. *See Ruhe*, 14 F. Supp. 3d at 1348 (finding that an arbitrator's unilateral decision made in violation of arbitration rules is grounds for vacatur).

250.    Mr. Appel did not hesitate to exercise his limitless powers.  Mr. Appel was the only signatory on every order and ruling in the case except the final award. This included a number of substantive rulings, such as those in Order No. 2 (which addressed the binding effect of Mr. Daniel's decision on the Tribunal), Order No. 5 (which addressed requests to move for summary disposition) and the Interim Order.

251.    Since Mr. Appel lacked the authority to unilaterally make any decisions, it follows that Order Nos. 1 through 10 and all other rulings are invalid.  None of these orders reflect a decision that was made by a majority of the arbitrators as required under Rule R-44. Order Nos. 1, 5 and 6 required the signatures of all three arbitrators but Mr. Appel was the only signatory and he signed all three signature lines.

252.    Order No. 2 only had a single signature line for Mr. Appel which he signed as Chair "For the Panel."  Order Nos. 3, 7, 8, 9 and 10 were not formal decisions but rather emails from Mr. Appel which he signed "for the full Panel." Except for the Award, there is not a single order or other ruling in which any of the other arbitrators indicated their assent to the decision.

## THE ARBITRATORS AWARDED SPECIFIC PERFORMANCE WITHOUT ANY POWER TO DO SO UNDER THE CONTRACT.

253.    Under AAA Commercial Rule R-47(a) an arbitrator may award any remedy or relief "within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." In this case, the Final Award required THM to specifically perform the contract by turning the Forms over to HealthSpring. However, since specific performance is not a form of relief within the scope of the BSA, the Tribunal exceeded its powers by awarding such relief.

254.    Specific performance is not mentioned anywhere in the BSA as a remedy for breach of contract.  To the contrary, the only remedy mentioned at all is indemnification for "all fines, penalties, losses, liabilities, claims, actions, proceedings (whether legal or administrative), damages, injuries, demands, costs, expenses attorneys' fees and other liabilities" (Dkt. No. 7, Ex. 1, 2013 Agreement, at Section 8).

255.    There is no question that under Tennessee law indemnification is a form of monetary relief. *See Winter v. Smith*, 914 S.W. 2d 527, 541-542 (Tenn. Ct. App. 1995). Thus by awarding specific performance the Tribunal was creating a form of relief that was not permitted under the contract. *See American Eagle Airlines v. Air Line Pilots*, 343 F. 3d 401, 410-11 (5th Cir. 2003)(holding that arbitral board lacked power to craft an alternative remedy); *see also Yahoo! Inc.*, 983 F. Supp. 2d at 317 (finding that arbitrator acted within the scope of his authority where decision was reached out of an effort to construe and apply explicit provisions of the agreement).

**THE ARBITRATORS IMPROPERLY AWARDED HEALTHSPRING ARBITRATION FEES THAT THM OWED TO THE AAA.**

256.    The Tribunal also exceeded its powers by awarding HealthSpring fees that the Tribunal claimed THM owed to the AAA arbitrators. There is absolutely no contractual basis for making this such award.

257.    AAA Commercial Rule 43(a) provides that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." However, where neither the contract nor the AAA Rules incorporated into the contract authorize the Arbitrator to award a particular remedy, the arbitrator acts outside the scope of his or her authority. *See Interchem Asia 2000 v. Oceana Petrochemicals*, 373 F. Supp. 2d 340, 357-58 (S.D.N.Y. 2007).

258.    Here the arbitrators had no authority to award HealthSpring THM's share of

arbitrators' fees.  There are no provisions in the contract that entitle a party to amounts that the other party owes to the AAA. (Dkt. No. 7, Ex. 1, Amendment, at Section 9(f)) To the contrary, the BSA clearly provides that a party is only entitled to compensation for its own losses (Dkt. No. 7, Ex. 1, Amendment, at Section 8).

259.    HealthSpring did not incur any liability for amounts that THM owed to the AAA. The BSA also provides that each party is responsible for paying its own costs and fees to the AAA (Dkt. No. 7, Ex. 1, 2013 Agreement, at Section 9(f)).  The Tribunal simply ignored these provisions.

260.    Furthermore, there is no contractual basis for the manner in which the Tribunal calculated the apportionment of the fees.  The BSA states that the parties will pay their "own costs and fees" (Dkt. No. 7, Ex. 1, 2013 Agreement, at Section 9(f)).  The parties had agreed in an email exchange that HealthSpring would bear the arbitrator compensation for two of the three arbitrators, and the parties would split the compensation of the third arbitrator (Dkt. No. 7, Ex. 12).  The AAA was well aware of this agreement and noted it in the file (Dkt. No. 7, Ex. 12).

## THE ARBITRATORS WERE COLLATERALLY ESTOPPED FROM RULING ON ISSUES THAT HAD ALREADY BEEN DECIDED BY EMERGENCY ARBITRATOR DANIELS.

261.    The Tribunal had no right to re-decide the issues that were settled in Mr. Daniels' decision in the Rule R-38 proceeding. The Tribunal trivialized his legal conclusions and labeled them "dicta."  It belittled his factual findings and called them "interim in nature." It declared that Mr. Daniels' decision was not binding on the Tribunal. Ultimately, the Tribunal overwrote his decision entirely.  This is outrageous.

262.    Mr. Daniels as an emergency arbitrator was not subordinate to the Tribunal.  He had the same powers as the Tribunal to issue awards and make other rulings. *See* AAA Commercial

Rules, Rule R-38. In his decision, Mr. Daniels exercised these powers and adjudicated substantive issues in the case. He interpreted the contract and determined the parties' respective legal obligations. He found that the terms of contract were clear and unambiguous and that HealthSpring was obligated to continue paying for HMRs and Labs as a matter of law.

263.    By failing to honor Mr. Daniels' decision, the Tribunal ran afoul of the well-established principle that arbitrators cannot re-decide the issues of an earlier arbitral proceeding. *Bear, Stearns & Co. v. 1109580 Ontario*, 409 F. 3d 87, 91 (2nd Cir. 2005); *F. Hoffmann-La Roche Ltd. v. Quiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 327-28 (S.D.N.Y. 2010)(noting that "had the Panel ignored… or even questioned [the prior arbitral] conclusions, this Court would have serious reservations about the validity of the Final Award").

264.    The Tribunal was also bound by the principle of *functus officio* which, as codified in the AAA Rules, prohibits an arbitrator from "re-determin[ing] the merits of any claim already decided." AAA Commercial Rules, Rule R-50; *see Southern Seas*, 606 F. Supp. at 695. This principle is not limited to final awards and equally applies to any decision that resolves an issue that an arbitrator has been asked to arbitrate. *See Publicis Communication v. True North Communications Inc.*, 206 F.3d 725, 728-29 (7th Cir. 2000); *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 689 F.2d 301, 306 (2nd Cir. 1982).

265.    Mr. Daniels' decision involved interpreting the meaning of the pricing terms in the contract, an issue which he found was central to his decision whether to grant THM emergency relief. He had been asked to determine if THM was entitled to an award for non-payment of the invoices on an emergency basis (Dkt. No. 7, Ex. 6, at p. 3).

266.    No doubt Mr. Daniels believed that this meant first interpreting the contract to determine if THM had a contractual right to be paid for the invoices in the first place. This is

evident from Mr. Daniels' statements during the emergency hearing:

> MR. DANIELS: So one of the issues I see as potentially important in this case is the interpretation of the contract versus the external evidence. I believe there is an integration clause in the contract so, and we're obviously getting testimony in about intent and what-not outside of the contract, but I believe one of the determinations I'm probably going to end up making is whether there's any ambiguity in the contract. If there isn't you're both welcome to give me the law on this, but I would not be surprised if external evidence is not relevant.

(Dkt. No. 7, Ex. 7, at Tr. 8-22).

267.    Mr. Daniels thus devoted the first six pages of his decision to examining the contract for ambiguities that would preclude incorporating the pricing terms in the 2013 Agreement into the Amendment. He concluded that based on the plain meaning of the contract terms, the pricing terms were incorporated and HealthSpring was obligated to pay the invoices as a matter of law (Dkt. No. 7, Ex. 8, at pp. 6-7).

268.    It was only after Mr. Daniels reached a conclusion as to the meaning of the pricing terms that he turned to the issue of whether HealthSpring breached the contract by failing to pay the Invoices.

269.    On this issue, Mr. Daniels declined to make a ruling due to ripeness, finding that "Respondent is not obligated to make any payment on HMRs or labs until on or about April 21, 2017" (Dkt. No. 7, Ex. 8, at p. 7). This finding on ripeness clearly rested on his contract interpretation that HealthSpring had an "obligat[ion] to make [a] payment" (Dkt. No. 7, Ex. 8, at p. 7).

270.    The contract interpretation presented by the Tribunal in its Award is nothing more than a re-interpretation of the same terms that were examined by Mr. Daniels. As in Mr. Daniels' decision, the Tribunal examined whether the rate paid by HealthSpring under the contract was an all-inclusive price that applied for each 360 Exam regardless of whether THM performed a HMR or

Lab, or if separate rates applied for the 360 Exam, the HMR and Lab.

271.    This was done for the same reason as in the Rule R-38 proceeding, namely to assess if HealthSpring had a contractual obligation to pay the Invoices.  The Tribunal was re-deciding Mr. Daniels ruling and therefore its decision cannot stand under the doctrine of collateral estoppel. It also had no authority to re-decide the issue under the doctrine of *functus officio*.

## THE ARBITRATORS ACTED IN MANIFEST DISREGARD OF THE LAW.

272.    In order to find that an arbitrator has acted in manifest disregard of the law, two elements must be satisfied:  (1) the governing law alleged to have been ignored by the arbitrators must have been well defined, explicit, and clearly applicable, and (2) the arbitrator must appreciate the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *Jock*, 143 F. Supp. at 133.

273.    In this case the Tribunal failed to follow two clearly applicable laws.  First, the Tribunal failed to interpret the BSA based on the plain meaning of the contract language. Second, the Tribunal ruled on claims arising under an oral contract without deciding whether the claims under the contract are arbitratable.

## THE ARBITRATORS FAILED TO INTERPRET THE CONTRACT PRICING TERMS BASED ON THEIR PLAIN MEANING.

274.    The arbitrators acted with manifest disregard of the law by ignoring the plain meaning of the pricing terms in the BSA. Without identifying any ambiguities in the contract, the Tribunal proceeded to interpret the pricing terms on the basis of extrinsic evidence, which was a clear violation of the parol evidence rule. As experienced attorneys, the arbitrators knew how to interpret a contract and their failure to apply the most basic principles of contract interpretation is inexcusable.

275.    The courts have found that an arbitrator acts in manifest disregard of the law if he

or she disregards or modifies unambiguous contract provisions. *Patten v. Signator Ins. Agency, Inc.*, 441 F. 3d 230, 235 (4th Cir. 2006). Where the plain meaning of the language in a contract is unambiguous, it is presumed to evince the parties' intent, and the arbitrator must give effect to the parties' agreement as written. *See*, *Alcan Packaging Co. v. Graphic Communication*, 729 F. 3d 839, 845 (8th Cir. 2013); *Boise Cascade Corp. v. Paper-Allied Indus.*, 309 F. 3d 1075, 1082 (8th Cir. 2002); *Aspic Engineering and Const. Co. v. ECC Centcom*, 268 F. Supp. 3d 1053, 1059-60 (N.D. Cal. 2017).

276.    Under Tennessee law, the terms of a contract are considered to be ambiguous only if they are uncertain as to meaning and may fairly be understood in more ways than one. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W. 3d 885, 890 (Tenn. 2002). If an ambiguity exists, then extrinsic evidence may be examined to the extent that it does not "alter, vary, or qualify the plain meaning of an unambiguous written contract." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005).

277.    Here, the pricing terms in the BSA are crystal clear. As set forth in Section 6 of the Amendment, in 2015 the price per 360 Exam was $345 for the first 10,000 exams completed in Texas, and $295 for each exam completed in Texas in excess of 10,000 (Dkt. No. 7, Ex. 1, Amendment, at Section 6).

278.    In 2016 the price per 360 Exam was $295 for each exam completed in Texas (Dkt. No. 7, Ex. 1, Amendment, at Section 6). In 2015 and 2016 the price per HMR was $50 and the price per Lab was $50. Except for the change in the exam rate the Amendment did not alter any of the pricing terms under the 2013 Agreement.

279.    The Tribunal refused to accept the plain meaning of these provisions. In its contract interpretation analysis, the Tribunal noted upfront that "its first task is to determine whether the

payment provisions of the Agreement are unambiguous based on the four corners of the Agreement, or whether the Agreement is ambiguous and requires extrinsic evidence to determine the parties' intent" (Dkt. No. 7, Ex. 31, at p. 11).

280.    But despite acknowledging this rule of contract interpretation, the Tribunal failed to apply it.  Without even examining the contract language for ambiguities, the Tribunal summarily concluded that "the Agreement in its entirety is ambiguous as to the parties' intent regarding Texas pricing" (Dkt. No. 7, Ex. 31, at p. 11).

281.    The Tribunal attempted to explain this conclusion by way of example.  It stated that the "true-up" provisions would be "distort[ed] and potentially ma[d]e meaningless" if a $295 flat rate were not applied. This, according to the Tribunal, would be an "incongruous result" and therefore an ambiguity existed as to the parties' intent.

282.    This example does not show how any of the pricing terms in the Amendment, or the agreement as a whole for that matter, are ambiguous and thus susceptible to multiple meanings (Dkt. No. 7, Ex. 31, at p. 12).  Rather, it revealed that the Tribunal's purpose in interpreting the contract was to re-write the pricing terms because it believed there would be an undesirable outcome if the pricing terms were applied as written.  It is evident that the Tribunal did not actually believe that the pricing provisions were ambiguous because it was able to apply their literal meaning in reaching the conclusion that an "incongruous result" would follow if the separate pricing for HMRs and Labs were applied (Dkt. No. 7, Ex. 31, at p. 12).

283.    The Tribunal also attempted to justify its finding due to its belief that the term "flat rate" as used in Section 6 of the Amendment is ambiguous.  But the Tribunal reached this conclusion without even looking within "the four corners of the agreement."  The Tribunal lifted the term out of context and declared that "there is no universally accepted, generally recognized

definition of 'flat rate'...." (Dkt. No. 7, Ex. 31, at p. 12). The Tribunal did not examine the plain meaning of the term as it is used within the contract.

284.    Had the Tribunal applied its own standard of contract interpretation it would have realized that the meaning of term "flat rate" has a clear meaning within the four corners of the contract. As it appears in the contract the term refers to the "flat rate reimbursed to Vender per month."

285.    There is only one monthly rate mentioned in the contract, and this is the "$393,235 monthly payment" mentioned in Section 6. The rate is obviously "flat" because it is a fixed fee per month. This issue of contract interpretation was in fact addressed by Emergency Arbitrator Daniels in his decision:

> Respondent argues that because flat rate reimbursement is not specifically defined in the Agreement, that term is ambiguous and resort must be had to parol evidence to discern the intent of the parties. However, I find no ambiguity. A plain reading of the words "flat rate" means a rate that does not vary in proportion with something. Thus I understand the use of these words as establishing an intent that the monthly advance payment would be fixed and would not vary based on the number of 360 exams performed, subject to later true up.

(Dkt. No. 7, Ex. 8, at p. 5).

286.    The Tribunal consisted of a panel of highly skilled, experienced attorneys who undoubtedly understood the fundamental principles of contract interpretation. Their failure to apply the plain language of the contract is reckless and inexcusable. *See Rivera v. Thomas*, 316 F. Supp. 2d 256, 261-62 (Dist. Maryland 2004); *Bull HN Info. Sys., Inc. v. Hutson,* 118 F. Supp. 2d 55, 62 (D. Mass. 1999)(finding manifest disregard of the law where decision is based on reasoning so palpably faulty that no judge, or group of judges, could conceivably ever have made such a ruling).

287.    They made it clearly known in the decision that they had a problem with the

outcome that would follow if the contract terms were applied as written.  This is not a valid reason to re-write the contract.

### THE ARBITRATORS FAILED TO RULE ON THE ARBITRABILITY OF THE ALLEGED ORAL CONTRACT IN ARIZONA.

288.     The Tribunal also acted with manifest disregard for the law by failing to rule on an objection raised by THM as to the arbitrability of claims that HealthSpring brought pursuant to an alleged oral contract.

289.     In its Answering Statement, HealthSpring brought claims against THM pursuant to an alleged oral contract that was entered into in "early 2015" for the performance of "health services" in Arizona (Dkt. No. 7, Ex. 11, at ¶37).  But HealthSpring did not clearly indicate in the Answering Statement if the alleged oral contract was part of or separate from the BSA. On May 24, 2017 THM submitted an objection to the arbitrability of all claims arising under the oral contract pursuant to AAA Commercial Rules, Rule R-7(c).

290.     THM objected on the grounds that the alleged oral contract did not contain an arbitration agreement as required by AAA Commercial Rules R-1 and R-2 (Dkt. No. 7, Ex. 35). THM argued that as a result the AAA did not have jurisdiction over these claims and was not authorized to administer arbitration.

291.     The Tribunal ruled in Order No. 2 that based on "ambiguity and uncertainty" regarding the parties' respective positions on the oral contract, it was "premature for the Panel to issue any rulings on arbitrability based on the purported existence and terms of the agreement" (Dkt. No. 7, Ex. 14, at p. 5). The Tribunal further concluded that it "reserves ruling on this issue until further in the proceedings" (Dkt. No. 7, Ex. 14, at p. 5).

292.     But the Tribunal failed to make any further ruling.  Instead, in the Award the Tribunal found that the oral contract existed and then proceeded to rule on whether THM breached

the agreement. This was improper because the Tribunal could not rule on the issue of breach of contract without first finding that the contract is arbitratable.

293.     By passing over the issue of arbitrability, the Tribunal disregarded the requirements of Rule R-7(c) and its decision in Order No. 2.

### CONCLUSION

294.     The manner in which THM was treated in the Arbitration is abhorred.  THM was prejudiced throughout the proceedings by an unruly Tribunal commandeered by its Chair, Mr. Appel.  Mr. Appel alone made decisions and signed documents on behalf of the entire Tribunal though he lacked the authority to do so.  He denied THM access to pricing information that was significant to THM's Sherman Act claim.  He interrupted THM's cross-examination to answer questions for the witnesses and/or convince them to change their answers. During THM's cross-examination he advocated for HealthSpring and argued against THM in the presence of witnesses and the other arbitrators.  He denied THM access to legal counsel and allowed THM's witnesses to be deposed without THM's counsel present.  He awarded HealthSpring possession of the Forms without any assessment of the merits of the breach of contract claim or irreparable harm to HealthSpring. He ignored Mr. Daniels' ruling on the pricing terms in the contract. He did all of this while at the same time accepting financial incentives from HealthSpring and its parent company Cigna.

295.     The product of all of these injustices was a skewed Award in HealthSpring's favor that ignored the plain meaning of the contract terms, granted equitable relief that was not permitted under the contract, awarded HealthSpring arbitration fees that THM apparently owed to the AAA and established the existence of an oral contract for which arbitrability had never been established. There is no case more worthy that vacatur that this one. An Arbitration rife with so much

wrongdoing does not deserve a rubber stamp confirmation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Petitioner pray for the following relief:

1.      Defendant Becker be ordered to pay compensatory damages to Plaintiffs HFM, HGCF and THM, jointly, or to any one of them, in the amount of $205,597.41;

2.      Defendant Becker be ordered to pay punitive damages to Plaintiffs HFM, HGCF and THM, jointly, or to any one of them, in the amount of $616,792.23 in the aggregate;

3.      Defendant Becker be ordered to pay compensatory damages to Plaintiff THM in the amount of $102,798.71;

4.      Defendant Becker be ordered to pay punitive damages to Plaintiff THM in the amount of $308,396.12;

5.      Defendant Amon be ordered to pay compensatory damages to Plaintiff Stroffolino in the amount of $25,000;

6.      An order vacating the Final Award in its entirety and directing the AAA to appoint a new tribunal to re-hear the arbitration matter;

7.      Defendant HealthSpring be ordered to pay all fees and costs incurred by THM in bringing this action; and

8.      Plaintiffs be granted such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action on all issues triable by jury.


Dated: _____ 2019                    Respectfully submitted,

By: /s/ Robert A. Cutler
LAW OFFICE OF ROBERT A. CUTLER
100 Partrick Road
Westport, CT 06880
Tel:   (347) 449-0448
robertcutleresq@gmail.com
New York State Bar No. 4179404

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on January 7, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ Robert A. Cutler
Robert A. Cutler